**EXHIBIT D**

# UNITED STATES DISTRICT COURT

for the

Central District of California



)
In the Matter of the Search of                                        )
*(Briefly describe the property to be searched or identify the person by*    )    Case No.
*name and address)*                                                    )
Wells Fargo Safety Deposit Box                                        )    **MJ 19-00301**
No.                                    located at                      )
Wells Fargo Bank,                      Cerritos, CA                    )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

*See Attachment A-3*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized):*
*See Attachment B-3*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
&#9746; evidence of a crime;
&#9746; contraband, fruits of crime, or other items illegally possessed;
&#9746; property designed for use, intended for use, or used in committing a crime;
&#9744; a person to be arrested or a person who is unlawfully restrained.

FILED
CLERK, U.S. DISTRICT COURT

FEB - 4 2019

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | Dealing in Firearms Without A Federal Firearms License |
| 18 U.S.C. § 922(a)(3) | Transporting a Firearm Purchased in one State into a State of Residency |
| 18 U.S.C. § 922(a)(6) | Providing False Information to an Federal Firearms License During Acquisition of a Firearm |
| 26 U.S.C. §§ 5861(d) and (e) | Possession and Sale of a Short-Barreled Rifle |
| 18 U.S.C. § 1001 | Making False Statements to A Government Official |
| 26 U.S.C. § 7201 | Tax Evasion |
| 26 U.S.C. § 7206(1) | False Statements on a Tax Return |
| 26 U.S.C. § 7206(2) | Aiding or Assisting in the Preparation of False Tax Returns |
| 18 U.S.C. § 287 | False Claims Against the Government |
| 18 U.S.C. § 286 | Conspiracy to Defraud the Government with Respect to Claims |
| 18 U.S.C. § 641 | Theft of Public Money |
| 18 U.S.C. §§ 1341 and 1343 | Mail and Wire Fraud |
| 31 U.S.C. §§ 5341 and 5322 | failing to file and FBAR |

The application is based on these facts:
*See attached Affidavit*
&#9746; Continued on the attached sheet.
&#9744; Delayed notice of_____days *(give exact ending date if more than 30 days:*_____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*
JEFFREY M. BARTEL, Special Agent - FBI

Sworn to before me and signed in my presence.                              *Printed name and title*

Date: February __/__, 2019                                    **ROZELLA A. OLIVER**

_____
*Judge's signature*

City and state: Los Angeles, CA                ROZELLA A. OLIVER, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Annamartine Salick, (213) 894-3424

## ATTACHMENT A-3 (SAFETY DEPOSIT BOX)

PREMISES TO BE SEARCHED

Wells Fargo Safety deposit box, number

located at Wells Fargo Bank at Cerritos,

California

### ATTACHMENT B-3 (SAFETY DEPOSIT BOX)

**I.   ITEMS TO BE SEIZED**

117. The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 922(a)(1)(A) (Dealing in Firearms Without A Federal Firearms License ("FFL"))[13], 18 U.S.C. § 922(a)(3) (Transporting a Firearm Purchased in one State into a State of Residency), 18 U.S.C. § 922(a)(6) (Providing False Information to an FFL During Acquisition of a Firearm), 26 U.S.C. §§ 5861(d) and (e) (Possession and Sale of a Short-Barreled Rifle), 18 U.S.C. § 1001 (Making False Statements to A Government Official), 26 U.S.C. § 7201 (Tax Evasion), 26 U.S.C. § 7206(1) (False Statements on a Tax Return), 26 U.S.C. § 7206(2) (Aiding or Assisting in the Preparation of False Tax Returns, 18 U.S.C. § 287 (False Claims Against the Government), 18 U.S.C. § 286 (Conspiracy to Defraud the Government with Respect to Claims), 18 U.S.C. § 641 (Theft of Public Money); 18 U.S.C. §§ 1341, 1343 (Mail and Wire Fraud), and 31 U.S.C. §§ 5314 and 5322 (failing to file an FBAR),(the "Subject Offenses"), namely:

   a.   Records, documents, programs, applications or materials related to:

      i.   Wei Xu ("XU") employment with U.S. Customs and Border Protection ("CBP"), including paystubs, awards, distinctions, and certifications;

---

[13] The term "FFL" also refers to the federally-licensed dealership itself, such as a gun store or other business that is owned by a licensed firearms dealer.

ii.   Background and security clearance records or submissions, such as the SF-86 questionnaire, and any documents or notes made in to prepare such records;

iii. XU's immigration into the United States and naturalization as a U.S. citizen, including any forms XU filed with U.S. Citizenship and Immigration Services ("USCIS") to obtain an immigration benefit;

iv.   Yanping Li's ("Li") immigration into the United States and naturalization as a U.S. citizen, including any forms XU filed with USCIS to obtain an immigration benefit;

v.   Bingya Liu ("Liu") travel to the United States, her visa application, and any other immigration benefits she may have sought;

vi.   XU and LI's U.S. Passports and any other passport or forms of identification in XU or LI's names and/or variants of XU and LI's names or anyone else, except a passport in Liu's name;

vii. International or domestic travel, including airline tickets, receipts, and itineraries;

viii.   The sale, purchase, receipt, manufacture or possession of firearms, ammunition, and firearm parts and accessories, including receipts, photographs, ledgers, accounting source documentation, sales invoices, purchase orders, list of property, account books, inventory records, profit or income statements, and expenses or loss statements, accounting records and paperwork documenting the sale, bills of sale, shipping receipts, credit card receipts, identification

xxvii

cards, bank statements, and correspondence discussing, requesting or confirming purchase, sale or shipment;

ix. Instructional manuals, booklets, or guides to manufacture or modify firearms;

x. Records or materials identifying firearm sellers and customers, including client files, listings, correspondence, telephone books, business cards, notes and other client information (including names, phone numbers, and/or addresses);

xi. Financial records such as bank statements, check registers, cancelled checks, deposit records, financial instruments, wire transfers, money transmittal receipts, and brokerage statements;

xii. China Auto Parts ("CAP") and Trans Pacific Group ("TPG"), including any incorporation documents, financial records, ledgers, bank account information, organizational charts, sales receipts, purchase orders, and CAP and TPG's business associates and vendors in U.S. and outside the U.S.;

xiii. Jianguo Tan ("Tan") and any other China-based business partners;

xiv. For the period January 1, 2002 to present, any federal income tax returns, IRS Forms 1040, 1040A, 1040X, and 1040EX, and electronically-filed versions of the same, tax schedules, copies of tax returns, and documents generated for the preparation of tax returns;

xv. Books, manuals, documents, audio/video materials and other records, materials and items pertaining

generally (as opposed to any particular individual or business entity) to federal taxes, federal tax return preparation, federal tax obligations, federal tax laws, the Internal Revenue Service, the federal tax code, and federal tax rules and regulations;

xvi. For the period January 1, 2002 to present, any communications with or about the Internal Revenue Service ("IRS");

xvii. From the period January 1, 2013 to present, any ledgers, account books, records, profit or income statements, and expenses or loss statements, and paperwork documenting the rental of ▮▮▮▮▮▮▮▮▮▮▮ Norwalk, California;

xviii. From the period January 1, 2013 to present, any receipts, invoices, or rental agreements for ▮▮▮▮ ▮▮▮▮▮▮ Norwalk, California;

xix. From the period January 1, 2004 to present, any escrow documents, sale agreements, contracts, mortgage/loan documents, deeds of trust, grant deeds, and HUD-1 statement relating to ▮▮▮▮▮▮▮▮ Norwalk, California;

xx. From the period January 1, 2015 to present, any document regarding purchase, ownership, or sales records of ▮▮▮▮▮▮▮ Santa Fe Springs, California.

xxi. From the period January 1, 2015 to present, any ledgers, account books, records, profit or income statements, and expenses or loss statements, and paperwork

documenting the rental of ▮▮▮▮▮▮▮▮▮ Santa Fe
Springs, California;

xxii.    From the period January 1, 2015 to
present, any receipts, invoices, or rental agreements for ▮▮▮
▮▮▮▮▮ Santa Fe Springs, California;

xxiii.    For the period January 1, 2002 to
present, any bank statements, brokerage statements, investment
records, account opening records, checks, wire transfers, money
orders and other money transfer records, credit card records,
check registers, cancelled checks and deposit and withdrawal
records;

b.    All firearms, ammunition, and firearm parts,
accessories, and parts or kits to build or modify firearms; and

c.    U.S. dollars or foreign currency in excess of
$5,000 USD;

d.    Any digital device which is itself or which
contains evidence, contraband, fruits, or instrumentalities of
the Subject Offense/s, and forensic copies thereof.

e.    With respect to any digital device containing
evidence falling within the scope of the foregoing categories of
items to be seized:

i.    evidence of who used, owned, or controlled
the device at the time the things described in this warrant were
created, edited, or deleted, such as logs, registry entries,
configuration files, saved usernames and passwords, documents,
browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.    evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.     records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

16.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created,

xxxi

modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

17. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## IV. SEARCH PROCEDURE FOR DIGITAL DEVICES

18. In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a. Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar

facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

      b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

      i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

      ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

      iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques [, including to search for known images of child pornography.]

      c.    If the search team, while searching a digital device, encounters immediately apparent contraband or other

evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been

able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

19.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

20.   During the execution of this search warrant, law enforcement is permitted to: (1) depress xu*g thumb- and/or ⟨his, his, and his⟩   RAO fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of xu*g face with his/eyes open to activate the facial-,   RAO (his, his, and his) iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

21.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Jeffrey M. Bartel, being duly sworn, declare and state as follows:

### I. INTRODUCTION

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since 2010. I am currently assigned to the Los Angeles Field Office's Long Beach Resident Agency. My duties include, but are not limited to, investigating allegations of unlawful acquisition and transfer of firearms, various types of fraud, and obstruction of justice. I have received both formal and informal training from the FBI and other institutions regarding computer technology and the investigation of electronic communications. I am familiar with the interpretation and application of federal laws and federal court procedures, and have previously assisted in the execution of numerous federal search and arrest warrants, including search warrants for the search of e-mail and social media accounts, computers, digital media and associated storage.

2. I am also trained to investigate firearm offenses, including violations of California and federal law and the National Firearms Act ("NFA"). Through my employment by FBI, I attended firearm trainings and am required to be familiar with firearm identification and use. Prior to joining the FBI, I served in the U.S. Army, where I have received extensive training on a wide variety of firearms and weapon systems. During this investigation, I also worked closely with Special

Agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

3. Also during this investigation, I worked in tandem with Special Agents from the Internal Revenue Service ("IRS") Criminal Investigation to investigate federal tax violations. I also gained personal experience investigating financial crimes when I was previously assigned to an FBI squad that investigated extortion and bribery schemes, mortgage fraud, mail and wire fraud, and other financial crimes.

## II. PURPOSE OF AFFIDAVIT

4. I make this affidavit in support of an application for warrant to search the premises described below and in Attachments A-1, A-2, and A-3, (the "SUBJECT PREMISES"), for evidence, contraband, fruits, and instrumentalities of criminal violations of 18 U.S.C. § 922(a)(1)(A) (Dealing in Firearms Without A Federal Firearms License ("FFL")),[1] 18 U.S.C. § 922(a)(3) (Transporting a Firearm Purchased in one State into a State of Residency), 18 U.S.C. § 922(a)(6) (Providing False Information to an FFL During Acquisition of a Firearm), 26 U.S.C. §§ 5861(d) and (e) (Unlawful Possession and Transfer of an Unregistered Short-Barreled Rifle), 18 U.S.C. § 1001 (Making False Statements to A Government Official), 26 U.S.C. § 7201 (Tax Evasion), 26 U.S.C. § 7206(1) (False Statements on a Tax Return), 26 U.S.C. § 7206(2) (Aiding or Assisting in the Preparation of False Tax Returns), 18 U.S.C. § 287 (False Claims

---

[1] The term "FFL" also refers to the federally-licensed dealership itself, such as a gun store or other business that is owned by a licensed firearms dealer.

2

Against the Government), 18 U.S.C. § 286 (Conspiracy to Defraud the Government with Respect to Claims), 18 U.S.C. § 641 (Theft of Public Money), 18 U.S.C. §§ 1341 and 1343 (Mail and Wire Fraud); and 31 U.S.C. §§ 5314 and 5322, and 31 C.F.R. § 1010.350 (Failure to File an FBAR).

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended merely to show that there is sufficient probable cause for the requested search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only and all dates are approximate.

### III. PREMISES TO BE SEARCHED

6.    The premises to be searched are the following, as set forth in greater detail in Attachments A-1, A-2, and A-3:

a.    A two-story, beige house with two-car attached garage, located at                        Santa Fe Springs, California          ("the SUBJECT RESIDENCE");

b.    A 2016 Black Maserati Ghibli, VIN

License Plate No.                the registered owner is Yan Ping Li, ("SUBJECT VEHICLE ONE");

3

c. A 2016 Green/Blue Honda CRV, VIN ███████ License Plate No. ███████ the registered owner is Wei Xu, ("SUBJECT VEHICLE TWO"); and

d. Wells Fargo safety deposit box, number ███████ located at Wells Fargo Bank at ███████ ███████ Cerritos, California ███████ ("XU's SAFETY DEPOSIT BOX"), (collectively the "SUBJECT PREMISES").

## IV. SUMMARY OF THE INVESTIGATION

7. The FBI is investigating Wei Xu, aka George Xu, aka Wade Xu ("XU"), a Watch Commander of the Los Angeles and Long Beach Seaport with the United States Department of Homeland Security's Customs and Border Protection ("CBP"), for possible violations of the offenses enumerated above. XU is currently assigned to a CBP facility in Long Beach, California, and resides at the SUBJECT RESIDENCE.

8. In connection with his CBP employment, as detailed below, there is probable cause to believe XU made false statements about, and concealed, material facts under penalty of perjury in three background investigation questionnaires, known as SF-86 Questionnaires that XU submitted to obtain a SECRET-level security clearance. Specifically, XU concealed his financial interest in, and continuing employment with, two businesses --- China Auto Parts, Inc. ("CAP") and Trans Pacific Group, Inc. ("TPG") -- that import auto parts into the United States from China.

9. During its investigation, the FBI found evidence that XU is also engaged in the unlawful business of dealing firearms

4

without a firearms license. XU has exploited his status as a federal law enforcement officer to acquire firearms not available to the general public and used an Arizona driver's license to purchase weapons in Arizona in order to transport and sell the firearms in California, all for a profit.

Moreover, XU unlawfully sold four firearms, including a short-barreled rifle and high-capacity magazines, to an ATF Undercover Employee.

10. The IRS is also investigating XU and his current wife, Yan Ping Li ("Li"), for failing to: 1) report earned income from the firearms business, 2) failing to report a foreign account(s), 3) failing to report income from the sale of a property, and 4) and failing to report the rental income of two residential properties. As detailed below, XU purchased a condominium, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Norwalk, California (the "Norwalk Condo") that he rented to tenants from 2013 to 2017, until it was sold, but either under-reported or completely omitted the rental income earned and capital gain income from his 2013 through 2017 income tax returns filed with the IRS. In addition, Li owns a single family residence, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ Santa Fe Springs, California ("Elderberry Residence"), which she purchased with another individual, Bingya Liu ("Liu"), on October 30, 2015. Beginning in 2015, XU and/or Li rented the Elderberry Residence to tenants, but did not report the earned income on their income tax returns from 2013 to 2017 filed with the IRS. Finally, XU discarded evidence in his trash that

indicates he owns a foreign bank account, and has thus far, not reported such on his income tax returns filed with the IRS.

## V. STATEMENT OF PROBABLE CAUSE

### A. Background Information on XU and Associates

#### 1. Immigration Records

11. Based upon my conversations with United States Citizenship and Immigration Services ("USCIS") officers and Special Agents of the Department of Homeland Security's Homeland Security Investigations, I know the following:

a. USCIS is the agency within Department of Homeland Security that is charged with administrating the legal process used by foreign nationals to immigrate to the United States. USCIS is responsible for the administration of the immigration and naturalization adjudication functions and establishing immigration services and policies.

b. The term "A-File" refers to an Alien Registration File, maintained by USCIS, that contains immigration records for aliens admitted to, or found within, the United States. These records can include, but are not limited to, photographs, fingerprints, employment-related documents, and immigration petitions filed by, or on behalf of, an alien.

12. During the course of the investigation, I reviewed the A-files for XU; his former wife, Man Ping Wang ("Wang"); and his current wife, Li. From my review, I learned the following, much of which is based on self-reporting by XU, Wang, and Li:

a. XU was born in China in 1962. Wang was born in China in 1965. Li was born in China in 1971.

6

      b.   XU was employed as an engineer in China from 1984 to 1987. In 1987, XU came to the United States on a student visa, and has resided in the United States ever since.

      c.   In October 1990, XU married Wang in China. Wang immigrated to the United States in November 1990.

      d.   Beginning in 1996, XU listed his employment in immigration documents as the manager CAP, working out of his residences, first in Florida and then California. Beginning in 1997, XU listed his employment as the manager of TPG, again, working out of his residences.

      e.   In June 1998, XU submitted to USCIS an application for naturalization and reported that he had been employed as a manager for CAP since December 1996, working out of his residence. In December 1998, Wang submitted to USCIS an application for naturalization in which she reported that she had been employed as a manager for CAP since December 1996, working out of the same residential address in Florida that XU listed in his application.

      f.   On July 3, 1999, USCIS sent XU a notice to 612 Spring Valley Road, Altamonte Springs, Florida, notifying XU to appear for his naturalization ceremony. In July 1999, XU became a naturalized United States citizen. In February 2000, Wang became a naturalized United States citizen.

      g.   On August 31, 2000, a Florida court issued a final judgment dissolving XU and Wang's marriage.

h. In September 22, 2000, XU and Li married in China. After her marriage to XU, Li continued to reside in China until 2005.

i. In December 2001, XU moved from Florida to California, first residing in Chino Hills, California. From September 2002 until February 2004, XU was employed as an engineer at a company in La Verne, California. During this time, he continued to be employed as a manager for TPG, working out of his residence in Chino Hills.

j. On February 23, 2004, XU began employment with CBP.

k. On May 28, 2004, XU self-reported on an USCIS Form G-325A - Biographic Information, that he was still employed as a manager for TPG at his Chino Hills residence. XU signed the Form G-325A immediately above the following: "Penalties: Severe penalties are provided by law for knowingly and willfully falsifying or concealing a material fact."

l. A 2004 federal tax return for XU and Li (included in Li's A-file), shows, in addition to wages reported on XU's W-2 Forms, business income in the amount of $4,000. The tax return also reports a phone for XU of ▮▮▮▮▮▮▮ - XU's Cellular Telephone.[2]

m. On October 4, 2005, Li immigrated to the United States, and began residing with XU at the Norwalk Condo.

---

[2] According subscriber records from Verizon, telephone number ▮▮▮▮▮▮ is registered to XU at the SUBJECT RESIDENCE.

8

n.    In 2012, Li submitted to USCIS an application for naturalization, on which she reported a telephone number of ▇▇▇▇ ▇▇▇▇▇▇▇▇ and an e-mail address of the TRANS PACIFIC GROUP SUBJECT ACCOUNT.  She reported her occupation as housewife and reported no other employment.

o.    In January 2013, Li became a naturalized United States citizen and reported her home address as the SUBJECT RESIDENCE where she resides with XU.

2.    Property Records

13.   According to publically accessible deed records, XU and Li, own/owned three properties in California:

a.    On December 23, 2004, XU purchased the Norwalk Condo, and sold the property on January 17, 2017.  According to XU's self-reporting in the immigration documents described above, XU lived at this location alone, until Li joined him in 2005 after leaving China to live at the Norwalk Condo.  In June 2013, after he and Li moved to the SUBJECT RESIDENCE, XU began renting the Norwalk Condo tenants for approximately $1,800 a month from June 2013, until XU sold the Norwalk Condo in 2017.

b.    On March 20, 2013, XU purchased the SUBJECT RESIDENCE, a single-family residence located in Santa Fe Springs, California.  According to XU and Li's self-reporting in their immigration files and FBI surveillance, XU and Li appear to have resided at the SUBJECT RESIDENCE since its purchase in 2013.

c.    On October 15, 2015, Li and Liu purchased the Elderberry Residence.  As detailed below, XU and/or Li have

9

rented the Elderberry Residence to a tenant for approximately $2,400 a month since November 2015.

        d.    Based on my investigation, it is likely Liu is Li's niece and that Liu resides in China.

        i.    I spoke with a Los Angeles Airport police officer who interviewed Liu on April 26, 2018, as she departed Los Angeles International Airport for China. Liu stated that she was in the United States visiting her aunt and uncle and had stayed at her aunt and uncle's house. Liu told the officer that she does not own any property in the United States and does not have a bank account in the United States.

        ii.   According to FBI surveillance of Liu, Liu stayed at the SUBJECT RESIDENCE during a visit to the United States in 2015.

        iii.  In addition, Liu listed Li as a "relative" on her visitor visa application submitted to USCIS on May 20, 2015.

        e.    According to travel records, Liu entered the United States from China on January 14, 2019, and is scheduled to return to China on February 7, 2019. Liu traveled with XU and Li. Based on her prior visits to the U.S., it is likely Liu is staying at the SUBJECT RESIDENCE.

    **B.**    **XU Made Materially False Statements in His Security Clearance Background Check**

        1.    <u>XU Operates an Import Business That He Failed to Disclose in his Security Clearance Applications</u>

14. Based on my investigation detailed below, XU operates two import businesses, CAP and TPG, which import automobile

parts from China, sell the parts to distributors in the United States, and remit the profits from those sales back to China. According to records detailed below, XU incorporated CAP and TPG in Florida, prior to moving to California, and listed himself; his former wife, Wang; his current wife, Li; and his China-based business partner, Jianguo Tan ("Tan"), as the principles of the two businesses. In addition, XU listed his residences, first the residences in Florida at which he and Wang lived, next, the Norwalk Condo where XU and Li lived, and then the SUBJECT RESIDENCE, where XU and Li presently live, as the addresses of record for the businesses.

15. According to public records available on the Florida Department of State website on March 23, 2017, I know the following:

a. CAP filed its Articles of Incorporation in Florida on December 13, 1996. Those Articles of Incorporation show:

i. The principal office of CAP was ▋ ▋ Winter Park, Florida (the same address reported by XU on his immigration documents around the same time).

ii. XU was the registered agent for service of process of CAP at the above address.

iii. XU and Tan were the members of the Board of Directors of CAP.

iv. CAP was incorporated in Florida on December 13, 1996.

11

v.   On April 17, 2000, CAP filed a report with the Florida Secretary of State changing its address to ████ ████████ Altamonte Springs, Florida (the same address reported by XU on his immigration documents around the same time).

b.   TPG filed its Articles of Incorporation in Florida on March 6, 2000.  Those Articles of Incorporation show:

i.   The principal office of TPG was ████████ ████████ Altamonte Springs, Florida (the same address reported by XU on his immigration documents around the same time).

ii.  XU was the registered agent of TPG at the above address.

iii. XU and Tan were the members of the Board of Directors of TPG.

iv.  On April 18, 2002, TPG filed a report with the Florida Secretary of State changing the address of its principal place of business to ████████ Apopka, Florida, and its mailing address to ████████ Chino Hills, California, (the same address reported by XU on an immigration document around the same time).

v.   On February 29, 2004, TPG filed a report with the Florida Secretary of State that purported to bear the electronic signature of Wang, making the following changes:

(I)  Changing the members of the Board of Directors to Tan and Wang at ████████ Chino Hill, California.

12

(II) Changing the registered agent for the corporation from XU to Wang, at █████████████ Apopka, Florida.

vi. On April 25, 2005, TPG filed a report with the Florida Secretary of State that purported to bear the electronic signature of Wang, making the following changes:

(I) Changing the mailing address of the corporation to the Norwalk Condo. (Li listed the Norwalk Condo on immigration documents as the address where she resided with XU).

(II) Changing the addresses for Tan and Wang to the Norwalk Condo.

16. According CBP records, between January 1, 2015 and January 25, 2019, CAP and TPG have imported 139 cargo shipments into the United States from China.

2. XU Owns a Chinese Bank Account

17. On January 30, 2019, FBI personnel retrieved trash discarded outside the SUBJECT PREMISES and found a Bank of China passbook showing that "Wei Xu" owns a savings account ending in 6061-7. The passbook shows a first entry of July 1, 2002; the last entry is October 4, 2018. The maximum account balance reflected in the passbook is 11,460.23 CNY (Chinese Yuan Renminbi) or $1,701.37. According to the passbook, the account is held at the Tian Yao Qiao Road Branch location in Shanghai, China. Based on a review of open source information, the Bank of China does not operate in the United States.

3.    XU Makes Materially False Statements on his SF-86
      Applications

18.   Based upon my conversations with CBP Officers, I know
the following:

    a.    An SF-86 Questionnaire, completed every five
years, is required for all CBP officers.

    b.    An accurate SF-86 Questionnaire helps the
employing agency to identify an employee's potential personal,
professional, and susceptibility issues.

    c.    Reoccurring, periodic SF-86 Questionnaires
provide updated background information, disclosures of new or
reoccurring associations, and other new pertinent information
that may be material to decisions by the employing agency.

    a.    XU's June 8, 2015 SF-86 Questionnaire

19.   Based upon my review of XU's SF-86 Questionnaires, I
know the following:

    a.    XU signed the certification page of a completed
SF-86 Questionnaire on June 8, 2015.

    b.    On the certification page, directly above XU's
signature, was the following language:

    My statements on this form, and on any attachments to
    it, are true, complete, and correct to the best of my
    knowledge and belief and are made in good faith.  I
    have carefully read the foregoing instructions to
    complete this form.  I understand that a knowing and
    willful false statement on this form can be punished
    by fine or imprisonment or both (18 U.S.C. 1001).  I
    understand that intentionally withholding,
    misrepresenting, or falsifying information may have a
    negative effect on my security clearance, employment
    prospects, or job status, up to and including denial
    or revocation of my security clearance, or my removal
    and debarment from Federal service.

14

c. On the June 8, 2015 SF-86 Questionnaire, XU stated as follows:

i. XU provided a "home" e-mail address of the TRANS PACIFIC GROUP SUBJECT ACCOUNT --

ii. When directed to list all his employment activities over the past ten years, including full-time and part-time work, and self-employment, XU did not mention his work for either CAP or TPG.

iii. XU stated that his current spouse was Li, and that he and Li were married on September 22, 2000.

iv. XU stated that his former spouse was Wang, that he and Wang were divorced on "July 31, 2000 (estimated)," and that he did not know if Wang was deceased.

v. When asked, "Do you have or have you had, close and/or continuing contact with a foreign national within the last 7 years with whom you, your spouse, or your cohabitant are bound by affection, influence, common interests, and/or obligation?" XU answered "no."

vi. When asked, "Have you, your spouse, cohabitant, or dependent children EVER had any foreign financial interests (such as stocks, property, investments, bank accounts, ownership of corporate entities, corporate interests or businesses) in which you or they have direct control or direct ownership?" XU answered "no."

vii. When asked, "Have you, your spouse, cohabitant, or dependent children EVER had any foreign financial

15

interests that someone controlled on your behalf?" XU answered "no."

    viii.  When asked, "Have you in the last 7 years provided advice or support to any individual associated with a foreign business or other foreign organization that you have not previously listed as a former employer?" XU answered "no."

    ix. When asked, "Have you in the last 7 years been involved in any other type of business venture with a foreign national not described above (own, co-own, serve as business consultant, provide financial support, etc.)?" XU answered "no."

    *b. XU's August 2011 SF-86 Questionnaire*

    d. XU signed the certification page of a completed SF-86 Questionnaire on August 30, 2011.

    e. On the certification page, directly above XU's signature, was the following language:

> My statements on this form, and on any attachments to it, are true, complete, and correct to the best of my knowledge and belief and are made in good faith. I have carefully read the foregoing instructions to complete this form. I understand that a knowing and willful false statement on this form can be punished by fine or imprisonment or both (18 U.S.C. 1001). I understand that intentionally withholding, misrepresenting, or falsifying information may have a negative effect on my security clearance, employment prospects, or job status, up to and including denial or revocation of my security clearance, or my removal and debarment from Federal service.

    f. On the August 30, 2011 SF-86 Questionnaire, XU stated as follows:

      i.   XU provided a "home" e-mail address of the TRANS PACIFIC GROUP SUBJECT ACCOUNT--█████████████

      ii.  XU provided the name Kao Jianguo, with an address of █████████████ Apopka, Florida, as a person who knew him when he lived at █████████████ Altamonte Springs, Florida. (The name "Kao Jianguo" is similar to Tan's name, Jianguo Tan. According to the above-mentioned records of the Florida Secretary of State, Tan was the name of the other member (in addition to XU) of the Board of Directors for CAP and TPG, and, on April 18, 2002, TPG changed the address of its principal place of business to █████████████ Apopka, Florida.)

      iii. When directed to list all his employment activities over the past ten years, including full-time and part-time work, and self-employment, XU did not mention either CAP or TPG.

      iv.  XU stated that his current spouse was Li, and that he and Li were married on September 22, 2000.

      v.   XU stated that his former spouse was Wang, that he and Wang were divorced in August 2000, and that Wang's last known address was █████████████ Chino Hills, California.

      vi.  When asked, "Do you have or have you had close and/or continuing contact with foreign nationals within the last 7 years with whom you, your spouse, or your cohabitant are bound by affection, influence, and/or obligation?" XU only listed his mother and father.

    vii. When asked, about any "foreign financial interests" and directed to include "stocks, personal property, company shares, investments, or ownership of corporate entities," XU answered "no" to the following questions:

    (I) "Do you have or have you EVER had any . . . foreign financial interests of which you have direct control or direct ownership?"

    (II) "Do you have or have you had any foreign financial interests that someone controls on your behalf?"

    (III) "In the last 7 years, have you provided advice or support to anyone associated with a foreign business or other foreign organization that you have not previously listed as a former employer regarding any of the following:  management, strategy, financing, or technology?"

    *c.* *XU's March 2003 SF-86 Questionnaire*

    g. XU signed the certification page of a completed SF-86 Questionnaire on March 15, 2003.

    h. On the certification page, directly above XU's signature, was the following language:

> My statements on this form, and any attachments to it, are true, complete, and correct to the best of my knowledge and belief and are made in good faith.  I understand that a knowing and willful false statement on this form can be punished by fine or imprisonment or both (See Section 1001 of Title 18, United States Code).

    i. On the March 2003 SF-86 Questionnaire, XU stated as follows:

i.    XU stated that his current spouse was Wang
and that he had no former spouses. (By March 2003, XU and Wang
were divorced, and XU had married Li, who, at the time, resided
in China and was a Chinese national.)

ii.    XU stated that from July 1997 to October
2002, he was employed as a manager with TPG, with an address of
███████████████ Apopka, Florida, and his supervisor was
Wang.

iii. In response to the directive that he provide
information about three people who knew him well, XU provided,
among others, the name Kao Jianguo, with an address of ██████
███████████ Apopka, Florida, and stated that this person had
known him since May 1995.

iv.    XU answered "no" to the question, "Do you
have any foreign property, business connections, or financial
interest?"

20.    Based on my review of a Report of Investigation by the
United States Office of Personnel Management ("OPM") into XU's
March 15, 2003 SF-86 Questionnaire, I know the following:

a.    OPM conducted an investigation into XU's SF-86
Questionnaire from July 7, 2003 through November 7, 2003.
During that investigation, XU advised the investigator as
follows concerning TPG:

i.    From July 1997 to October 2002, XU was
employed by TPG in Apopka, Florida.

ii.    XU was a part-time manager.

19

iii. This company was no longer in business and he has no contact with past supervisors or co-workers.

iv. XU could not provide leads for this employment.

b. During the investigation, XU advised the investigator as follows:

i. Concerning the listed reference Kao Jianguo, Jianguo was a friend while XU lived in Florida however they had no contact since approximately April 2003.

ii. XU did not have any foreign property, business connections, or financial interests.

iii. XU had not had any other employments, particularly self-employment, during the past seven years.

c. During the investigation, the investigator contacted an administrative assistant with the Seminole County Tax Collector in Sanford, Florida, who advised their records showed the following:

i. XU took out an occupational license for TPG on January 14, 1997. The license was registered to

Altamonte Springs, Florida.

ii. XU renewed the license on September 1, 2003, and the license was to expire on September 30, 2004.

d. During the investigation, the investigator contacted two contacts at XU's former employer in Missouri (where XU worked from 1993 to 2002). Both contacts recalled that XU had an import business, and that he imported items from China to the United States, and then sold the items to vendors.

20

One contact stated that XU had this business when in Florida and might still have this business.

    e.    During the investigation, in October 2003, the investigator interviewed Wang.  Wang stated that:

    i.    XU had no foreign business contacts that of which she was aware.

    ii.  From 1997 to 2002, XU worked part time for "Trans Pacific [Group]" out of his home on a computer but she did not know what XU did.  TPG bought and sold merchandise within the United States and Wang did not think it did any business with foreign countries.

    **C.    XU Unlawfully Engages in the Business of Dealing Firearms Without a License, Makes False Statements on FFL Forms, and Sells a Short-Barreled Rifle to UCE**

    1.    Applicable Statutes

21.   The relevant text of 18 U.S.C. § 922(a)(1)(A) provides:

> It shall be unlawful for any person except a licensed importer, licensed manufacturer, or licensed dealer to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce[.]

18 U.S.C. § 922(a)(1)(A).

22.   The relevant text of § 921(a)(11) defines a dealer as:

> (A) any person engaged in the business of selling firearms at wholesale or retail, (B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) any person who is a pawnbroker. The term "licensed dealer" means any dealer who is licensed under the provisions of this chapter.

18 U.S.C. § 921(a)(11).

23. The relevant text of § 921(a)(21)(C) defines a dealer without a license "engaged in the business" of dealing in firearms as:

> [A] person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms.

18 U.S.C. § 921(a)(21)(C).

24. The relevant text of 18 U.S.C. § 922(a)(3) provides:

> It shall be unlawful for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to transport into or receive in the State where he resides (or if the person is a corporation or other business entity, the State where it maintains a place of business) any firearm purchased or otherwise obtained by such person outside that State[.]

18 U.S.C. § 922(a)(3).

25. The relevant text of 18 U.S.C. § 922(a)(6) provides:

> It shall be unlawful for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition under the provisions of this chapter[.]

18 U.S.C. § 922(a)(6).

26. The National Firearms Act ("NFA") requires certain firearms to be registered with the Secretary of the Treasury at the time the firearm is manufactured, imported, or transferred. The NFA defines a firearm to include "a rifle having a barrel or barrels of less than 16 inches in length." 26 U.S.C. § 5845(a)(3). ATF maintains the registry of all NFA registered firearms.

27. The relevant text of 26 U.S.C. § 5861 provides:

It shall be unlawful for any person ---

(d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record; or

(e) to transfer a firearm in violation of the provisions of this chapter[.]

26 U.S.C. § 5861(d),(e).

### 2. Federal and California Firearms Law and Record Requirements

28. I know the following based on my training and experience, conversations with ATF Special Agents, and review of the United States Code and the California Penal Code:

a. The California Department of Justice ("CA DOJ") Automated Firearms System ("AFS") records every lawful firearm transaction within the state of California, including Private Party Transfers ("PPTs"). AFS records for handgun purchases conducted through licensed firearms dealers are available since the 1930s; records for long-gun purchases, such as rifles and shotguns, conducted through licensed firearms dealers are

available since 2014; and records for PPT of handguns and long guns listing the seller and buyer are available since 2011 and 2014, respectively.

b.   To be lawful under California law, a PPT, which is defined as a firearm transfer where neither party holds both federal and California dealers' licenses, must occur at a licensed firearms dealer or FFL.  Additionally, under California law, the FFL must submit a "Dealer Record of Sale" ("DROS") for each PPT to CA DOJ.

c.   A DROS is an application to purchase or acquire a firearm in California and includes a description of the firearm(s) and the name and location of the FFL.  For each PPT, the FFL must include the name, address, and a photocopy of the government identification of the parties to the transaction.  In addition to the initial DROS submission, the FFL reports the DROS to CA DOJ when the purchaser takes possession of the firearm.

d.   The submission of the DROS to CA DOJ initiates a background check of the buyer for every firearms purchase or transfer.  California law limits handgun purchases to one handgun per person per 30-day period.  Peace officers are exempted from the 30-day waiting period but are subject to a 10-day waiting period, absent a letter from the officer's chief of police.

e.   ATF maintains "eTrace," an Internet-based tracing system, that can trace a firearm's history from its manufacture to the first retail purchaser.  eTrace assists domestic and

international law enforcement agencies by tracing the origin of firearms that have been recovered in criminal investigations.

      f.   ATF requires FFLs to submit Multiple Sales Reports ("MSR") to ATF anytime the same individual acquires two or more handguns within five business days from the same seller. MSRs identify the purchaser and the firearms acquired and ATF uploads the information into eTrace.

      g.   ATF Form 4473 is the Firearms Transaction Record promulgated by ATF that a buyer must fill out truthfully under penalty of a felony conviction for every lawful firearm purchase through an FFL. Form 4473 describes the firearm purchased and identifies the name, address, and date of birth, government-issued photo ID of the buyer, a National Instant Criminal Background Check System ("NICS") background check transaction number, and a short affidavit stating that the purchaser is eligible to purchase firearms under federal law. Form 4473 contains the following warning:

> I certify that the answers to Section A are true and correct. I am aware that ATF Form 4473 contains Important Notices, Instructions, and Definitions. I understand that answering "yes" to questions 11.a if I am not the actual buyer of the firearm is a punishable felony. . . . I also understand that making any false oral or writing statement, or exhibiting false or misrepresented identification with respect to this transaction, is punishable as a felony. **I further understand that the repetitive purchase of firearms for resale for livelihood and profit without a Federal firearms license is a violation of the law.**

(Emphasis Added).

h.  Question 11 of Form 4473 asks the buyer to indicate if they are the "actual transferee/buyer" of the firearm(s) listed on the form."  Questions 11 contains the following warning:

> You are not the actual buyer if you are acquiring firearm(s) on behalf of another person.  If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you.

i.  At the time the buyer takes possession of the firearm, which is often at the conclusion of the 10-day waiting period, the purchaser must re-certify on the ATF Form 4473 that all of the assertions made on the form during the initial application are true, correct, and complete.

j.  California law restricts the sale of handguns to those certified by the state as "safe handguns."  Handguns not on the "safe handguns" list are referred to as "off-list" or "off-roster" and only certain exempted persons, including law enforcement officers, may purchase these handguns from retailers.  "Off-roster" handguns garner higher-than-retail prices in PPTs because of the restrictions placed on them.  In addition, manufactures frequently offer "off-roster" handguns to qualified law enforcement personnel at a reduced price, which further increases the potential profit margin for law enforcement personnel who resell them.  Although it is not illegal for an exempted person to transfer an "off-roster" handguns via PPT to a person who is not exempted, the inflated market for "off-roster" handguns incentivizes exempted persons to engage in the business of dealing firearms which, if they do

not have federal and state licenses to deal firearms, is illegal.

3. __XU Engages in the Business of Dealing Firearms Unlawfully without a Licensee__

a. *Records Show XU Unlawfully Transferred 70 Firearms Since 2014 without a License*

29. According to the Federal Licensing System ("FLS") maintained by ATF that I reviewed, XU is not and has never been a licensed firearms dealer.

30. According to AFS records I reviewed, XU sold or otherwise transferred 70 firearms via FFL since 2014.[3]

31. Since 2014, XU transferred seven of the 70 firearms within two weeks from the date he purchased them. Four of those seven firearms were "off-roster" handguns. The chart below summarizes the seven transfers. Many of these transfers occurred within days of the purchase.

---

[3] Although it is likely that XU sold the firearms, because the DROS for PPTs do not indicate whether a firearm was purchased, as opposed to traded, it is not possible to definitively state whether all of the 70 firearms XU transferred were, in fact, sold.

| Make, Model, and Serial Number | Off-Roster | Type of Transfer | Date of XU Delivery | Date of Transfer | Days to Transfer |
|---|---|---|---|---|---|
| Beretta mod. M9A1, BER630374 | No | Used-PPT | 05/09/2014 | 05/09/2014 | 0 |
| Heckler & Koch mod. VP9, 224010203 | Yes | New | 09/24/2014 | 09/26/2014 | 2 |
| Glock mod. 43, ZMY255 | Yes | New | 05/30/2015 | 06/12/2015 | 13 |
| Smith & Wesson mod. 686-6, CXS7842 | No | New | 07/07/2015 | 07/13/2015 | 6 |
| Walther mod. CCP, WK022925 | Yes | New | 09/03/2015 | 09/12/2015 | 9 |
| Browning mod. Hi Power, 511MW50872 | No | Used-PPT | 08/15/2017 | 08/17/2017 | 2 |
| Ceska Zbrojovka mod. CZ75 compact Shadow, C418748 | Yes | Used-PPT | 06/19/2018 | 07/06/2018 | 7 |

32. Based on the AFS records, my training and experience, and conversations with ATF Special Agents, there is probable cause to believe XU is engaged in the business of dealing firearms without a license. Specifically, the large number of known firearm transfers and the short time period between the purchase and transfer of some of those firearms indicates that XU acquired the firearms with the intent to sell them and that XU likely had buyers for some of the firearms prior to taking delivery of the firearms. While any single transfer XU made via an FFL is legal, collectively, the number of firearms XU transferred and the short time period between the purchase and transfer of many firearms, strongly suggest that XU was illegally engaged in the business of dealing firearms without a license. In addition, as detailed below, the evidence also shows that XU falsely stated on ATF Forms 4473 that he was the actual transferor/buyer for the firearms he purchased when, in

fact, he was only the "nominal" or intermediary purchaser before he sold the firearms to third parties.

> b.  *XU Operates Two Internet Accounts to Sell
>      Firearms Without a License*

33.  Based on the information described below, XU operates two Internet accounts with PROVIDER TWO, the CALGUNS SUBJECT ACCOUNTS. PROVIDER TWO is an online marketplace for firearms, firearms parts and accessories, ammunition, and hunting and outdoor activities. I know, from my training and experience and conversations with other law enforcement personnel, that PROVIDER TWO is an Internet service provider of electronic communications and an online marketplace. Users can post advertisements for various items, including firearms, bid on items, and engage in private messages with other users. PROVIDER TWO also hosts online public forums for discussions on various topics related to the use of firearms. Subscribers of PROVIDER TWO accounts may view and respond to member posts, as well as send and receive private messages (also known as "PMs," "direct messages," or "DMs") through the site's Private Message function. Those private or direct messages are visible only to the sender and recipient, not to other members or the public.

34.  On August 30, 2017, the FBI retrieved a two-page document from the trash left outside XU's residence (the SUBJECT RESIDENCE). The document appears to be a spreadsheet listing online accounts and login information, including usernames and passwords for online accounts such as "Pay-Pal," "Bank of America," "Facebook" and others. Two entries under

"Calguns.net" (PROVIDER TWO) show the usernames "weixu" and "safari" and a corresponding password,         for both accounts.

35. I reviewed the publically visible posts made by the CALGUNS SUBJECT ACCOUNTS on PROVIDER TWO's website. Many of the accounts' posts were made in the "Private Firearm Sales - Long Gun" and "Private Firearm Sales - Handguns" marketplaces. PROVIDER TWO allows a user to select the "marketplace" in which to post a firearm advertisement. "Private Firearm Sales - Long Gun" and "Private Firearm Sales - Handguns" are two marketplaces hosted by PROVIDER TWO.

36. As of January 25, 2019, CALGUNS SUBJECT ACCOUNT ONE initiated 58 threads (strings of posted communications), 28 in the marketplace forum "Private Firearms Sales - Handguns" and four in the marketplace forum "Private Firearms Sales - Long Guns."

37. As of January 25, 2019, CALGUNS SUBJECT ACCOUNT TWO initiated 44 advertisement threads, 25 in the marketplace forum "Private Firearms Sales - Handguns" and one in the marketplace forum "Private Firearms Sales - Long Guns."

38. In addition, as detailed below, XU communicated with an ATF Undercover Employee ("UCE") via both CALGUNS SUBJECT ACCOUNTS to arrange for and negotiate the price of several firearms prior to meeting in person to finalize the purchases.

### 4. XU Exploits his Position as a Law Enforcement Officer to Sell "Off-Roster" Handguns

39. According to AFS records I reviewed, at least 14 of the 70 firearms XU transferred since 2014 were "off-roster." In addition, as discussed in detail below, one of the firearms XU sold to the UCE and many of the firearms XU offered to sell to the UCE are currently classified as "off-roster" handguns. Because the FBI's investigation is ongoing and because determining whether a handgun was classified as "off-roster" at the time it was purchased is time-consuming, the exact number of off-roster weapons XU transferred is not yet known, but it is likely to be more than 14. However, based on the totality of the information described in this affidavit, there is probable cause to believe that, for a substantial period of time, XU engaged in the business of dealing in "off-roster" firearms without a license, by exploiting his special status as a law enforcement officer.

### 5. XU Unlawfully Sold Firearms to the UCE in California that He Purchased in Arizona Using a Driver's License He Did Not Disclose to His Employer

40. According to Multiple Sales Report ("MSR") records, XU purchased at least two firearms in Arizona. Arizona does not require PPTs to be completed through FFLs, nor does Arizona require that records are made and retained for every firearm purchased through a PPT. Thus, ATF would not have any record of additional firearms XU purchased in Arizona that were not part of a multiple sales purchase, meaning the purchase of two or

more firearms within a five-day period from the same seller, or that XU obtained via PPT.

41. According to a 2010 MSR report, XU purchased two handguns at a gun show in Arizona and provided as identification an Arizona driver's license, number ▊▊▊▊ with an address of ▊▊▊▊▊▊▊▊▊▊▊ Glendale, Arizona, as identification. According to basic Internet research, the address on XU's Arizona driver's license is a large apartment complex in Glendale, Arizona.

42. I know, based on my training and experience, that when a person moves permanently from one state to another, that they are required to obtain a driver's license or identification document from the new state within a specific time frame, which varies from state to state. When a person applies for a new driver's license, they are typically required to surrender their old driver's license.

43. After learning that XU maintains an Arizona driver's license, I spoke with a CBP Officer who queried CBP's records and found that XU has never disclosed his Arizona driver's license or reported that he has lived at the address listed on his driver's license, as required on the SF-86 Background Questionnaire. XU also did not list the Arizona residence in any of his tax filings since 2011 (the earliest record the IRS maintains currently).

44. In addition, as discussed in more detail below, eTrace records show that one of the firearms XU sold to the UCE in California was originally purchased by XU in Arizona. Given the

32

number of XU's known transfers and XU's use of an undisclosed
Arizona driver's license to purchase firearms in Arizona, as the
FBI's investigation continues and additional eTrace records are
requested, it is likely eTrace records will show XU transported
additional firearms into California that he originally purchased
outside of the state.

6. XU Illegally Sells Firearms, Including a Short-
Barreled Rifle, to the UCE in California

45. According to my review of screenshots taken by a UCE,
beginning on June 12, 2018, the UCE, using two PROVIDER TWO
account profiles, responded to advertisements to sell firearms
that XU posted on PROVIDER TWO's website using the CALGUNS
SUBJECT ACCOUNTS. Following communications between the UCE and
XU using the CALGUNS SUBJECT ACCOUNTS, XU and the UCE arranged
four in-person meetings, during which XU sold the UCE a total of
four firearms, including an "off-roster" pistol, large capacity
magazines, and a short-barreled rifle, defined in 26 U.S.C.
§ 5845(a) as a rifle with a barrel measuring less than 16
inches.

a. On July 6, 2018 XU Sells an "Off-Roster"
Handgun to the UCE and Offers to Sell
Additional Firearms

46. On July 5, 2018, the UCE sent XU, via the CALGUNS
SUBJECT ACCOUNT ONE, a private message ("PM") inquiring about a
"CZ, model 75 Compact Shadow Line" that CALGUNS SUBJECT ACCOUNT
ONE advertised for sale on June 27, 2018 for "$2,700 or best
offer." I know from my training and experience and
conversations with law enforcement personnel, that a "CZ" model

75 Compact Shadow line is a variant of the Ceska Zbrojovka model CZ75 9mm pistol that is "off-roster" or "non-roster" in California, meaning that in order to purchase this CZ variant lawfully from an FFL, XU would have had to present proof of his "excepted" status as a law enforcement officer.

47. After exchanging several PMs, the UCE and XU, using CALGUNS SUBJECT ACCOUNT ONE, agreed to a negotiated price of $2,500 and for the sale to take place the following day at n FFL in Cerritos, California. XU, using CALGUNS SUBJECT ACCOUNT ONE, provided the UCE with XU's Cellular Telephone to communicate via text message.

48. According to my review of ATF reports, my conversations with the UCE, and a surreptitious audio recording the UCE made, I learned the following:

a. On July 6, 2018, the UCE exchanged a series of text messages with XU's Cellular Telephone to coordinate a meeting time at the FFL in Cerritos. At approximately 2:00 p.m., the UCE arrived at the FFL and met XU, who was seated in SUBJECT VEHICLE TWO in the parking lot, as they agreed. The UCE later positively identified XU from XU's California DMV photograph.

b. After exchanging greetings, XU retrieved a handgun box from SUBJECT VEHICLE TWO's trunk and told the UCE, "You know the reason I am selling it. I just bought a Python. It cost me three thousand something dollars. . . . I have to sell—I have to make room . . . ." (A Python is a .357 Magnum revolver made by Colt).

c.    XU showed the UCE the firearm, a CZ handgun, and stated, "It's a brand new one," that it had never been handled or shot, and that XU "had it for maybe a month or so."

d.    XU asked if the UCE wanted to "pay [him] now," before they entered the FLL, the UCE agreed, and provided XU $2,500.  The UCE then accompanied XU into the FFL to finalize the PPT paperwork.

e.    While they waited for the FFL to complete the PPT paperwork, the UCE told XU to keep the UCE's telephone number in case XU had other firearms for sale.  XU asked the UCE what type of firearms the UCE was looking to purchase and stated that he (XU) would send the UCE a list of firearms XU was willing to sell.

f.    After completing the PPT at approximately 2:35 p.m., the UCE and XU exited the FFL and departed the area separately.

g.    Later that day, at approximately 4:40 p.m., XU sent a PM to the UCE using CALGUNS SUBJECT ACCOUNT TWO, even though XU had previously engaged the UCE using CALGUNS SUBJECT ACCOUNT ONE.  XU's CALGUNS SUBJECT ACCOUNT TWO PM stated as follows:

> It was my pleasure to do business with you.  Here are
> some of the guns I may part with:
>
> Pistol:
> -Glock 34 w/night sights 9mm
> -Glock 35 .40
> -Glock 27
> -HK P2000 .40 and 9mm
> -HK P30 .40
> -Springfield XDM .40

```
-SW99 .40
-S&W 686 Prelock 4"
-Browning Hi-Power 9mm

Rifles:
-AK 47 7.65x39 Romania
-AK 47 74 5.45 Polish
-MSAR .223
-FN FAL 308
-Sig 556
-Beretta CX4
-AR15
-PPS43
```

Let me know if you are interested in at [sic] any.

Thanks,
Wade.

h.    Before the UCE was able to respond to XU, at approximately 4:45 p.m., XU, using XU's Cellular Telephone, sent the UCE a text message stating that he (XU) had sent the UCE a PM with a list of firearms XU was willing to sell.  The UCE responded by text message stating that the UCE was looking at the list.

i.    At 5:33 p.m., the UCE responded to XU's PMs stating that the UCE would let XU know if the UCE was interested in purchasing any of the firearms.

49.    On July 17, 2018, after the 10-day waiting period required under California law to purchase a firearm elapsed, the UCE returned to the FFL and picked up the "off-roster" handgun purchased from XU.  According to my inspection, the CZ pistol XU sold the UCE bears the serial number C418748.

50.    According to a June 17, 2018 DROS record, XU purchased the CZ model 75 Compact Shadow Line that he sold to the UCE from

an FFL in Artesia, California, and took possession of the "off-roster" pistol on June 29, 2018 -- two days after XU advertised the CZ for sale on PROVIDER TWO's website and five days before XU offered to sell it to the UCE. Because California law categorizes the handgun as "off-roster," the DROS indicates that XU provided documentation of his exempted status as a "peace officer - federal - active" in order to purchase the firearm.

51. Based on my training and experience, and conversations with other law enforcement personnel, it is likely XU purchased the CZ pistol on June 17, 2018 with the intent to sell it for a profit, exploiting his status as a law enforcement officer to purchase a firearm not available to the general public, and made a false statement on the form in affirming under oath that he was the actual buyer when, in fact, he intended to sell the firearm, as evident by his advertisement to sell the pistol two days before he took possession of the pistol. Furthermore, XU would have lied on the Form 4473 when he certified that his answers to the questions in Section A of the form were still true, correct, and complete, when in fact he was not the "actual buyer/transferee" and had already advertised the CZ pistol for sale.

        b.   *On July 12, 2018 XU Sells a Firearm He Purchased in Arizona to the UCE in California*

52. On July 9, 2018, the UCE sent a text message to XU's Cellular Telephone inquiring about the availability of the "Sig 556" rifle XU offered to sell the UCE in the list of weapons XU provided to the UCE on July 6, 2018. I know from my training

and experience, that "Sig 556" is a reference to a Sig Sauer 5.56 caliber rifle. After a series of text messages, XU agreed to sell the rifle, which he said was "new in box," to the UCE for $1,600 on July 12, 2018, at the FFL in Cerritos, California, where XU sold the "off-roster" handgun to the UCE on July 6, 2018.

53. According to my review of ATF reports, my conversations with the UCE, and a surreptitious audio recording the UCE made, I learned the following:

a. On July 12, 2018 at approximately 2:00 p.m., the UCE arrived at the parking lot of the FFL and recognized XU seated inside SUBJECT VEHICLE ONE. XU and a woman, later identified as Li, exited the vehicle. After introducing the UCE to Li, XU and the UCE stepped to the back of the vehicle outside Li's sight. The UCE remarked on XU's expensive vehicle, a Maserati sedan, to which XU responded, "I'm like you, playboy."

b. XU opened the trunk of his vehicle to reveal a blue rifle box which contained the rifle. XU explained that the UCE needed to "fix" the rifle in order to lawfully use it in California. XU stated, "If you want to use it in a California range or something . . . you need to put a little release or something."

c. XU told the UCE that he purchased the rifle in Arizona, where XU claimed to have lived, explaining that "you can buy anything" in Arizona but, that if he were to keep it in California "like this way," he would have to register it. XU told the UCE, "I transport[ed] it here, there's no registration

requirements, so I never registered a rifle . . . but if I want to keep it like this way, I, I, will have to register it, but I don't care, if you want it, I give it to you." When the UCE asked if he (the UCE) needed to do anything to make it compliant with California law, XU responded, "I don't care, if you want it, I give it to you."[4]

d.   Later in the conversation, XU described himself as a "dual resident," explaining that lives in Arizona in the winter and California in the summer.

e.   The UCE asked XU if they should go inside the FFL to complete the PPT lawfully. XU stated, "No, you don't need to . . . it's up to you." The UCE responded, "Ok, alright . . . yeah, let's just do it here then."

f.   On several occasions during the meeting, XU told the UCE the he had made a mistake in asking only $1,600 for the firearm and showed the UCE his cellular phone that displayed an advertisement purporting to sell the same type of firearm for $1,895. The UCE stated that he only brought the $1,600 they agreed upon but was interested in making additional purchases, specifically of the MSAR rifle XU offered to sell as part of the list of firearms XU sent the UCE on July 6, 2018. The UCE asked XU to hold the MSAR rifle for him and they agreed to the original price of $1,600 for the Sig Sauer 5.56 and the UCE took

---

[4] Based on my conversations with ATF Special Agents, XU is likely referencing an outdated California law requiring persons to register certain rifles that Arizona did not regulate. Under current California law, the rifle XU transferred to the UCE would qualify as an assault weapon, which is illegal to possess or transfer in California.

possession of the rifle.  The UCE took the rifle to his vehicle at which time he observed XU and Li enter XU's SUBJECT VEHICLE ONE together and exit the parking lot.

54.  Based on my inspection of the rifle XU sold the UCE on July 12, 2018, the firearm is a Sig Sauer 5.56 Caliber NATO rifle bearing the serial number JT007064.  According to the eTrace record for this rifle, XU originally purchased the firearm in Arizona on December 4, 2009 from an FFL in Phoenix, Arizona.

55.  On March 15, 2017, the FBI recovered the below handwritten receipt from the trash placed outside of the SUBJECT RESIDENCE:

Visible on the handwritten receipt is the date, "12/4/2013,"[5] the
name "Wei Xu," the location "Crossroads AZ,"[6] a notation showing
that the item was sold for cash in the amount of $1,500 with the
acronym "PIF," meaning "Paid In Full."  The make, model, and
serial number of the firearm listed on the receipt match the
firearm XU sold to UCE on July 12, 2018.

>    c.    On August 12, 2018, XU Sells the UCE an MSAR
>          Rifle and High-Capacity Magazines out of the
>          Trunk of SUBJECT VEHICLE ONE and Offers to
>          Sell the UCE a Short-Barreled Rifle

56.    On July 9, 2018, XU sent the UCE a text message
containing a web image of an MSAR rifle, stating, "[h]ere is
another interesting rifle you might be interested in" and
offered to sell it to the UCE for "2K."  Between July 26, 2018
and August 12, 2018, XU and the UCE exchanged a series of text
messages and PMs via PROVIDER TWO, eventually agreeing to meet
on August 12, 2018 in the parking lot of the FFL in Cerritos,
California, for XU to sell the MSAR rifle to the UCE.

---

[5] It is likely XU altered the date of purchase on the
handwritten receipt the FBI recovered from March 15, 2017, from
outside the SUBJECT RESIDENCE. In 2013, the IRS audited XU in
connection with his 2013 individual income tax return.  XU
provided IRS personnel the receipt FBI retrieved from outside
the SUBJECT PREMISES on March 15, 2017, to substantiate XU's
claim of $1,500 in unreimbursed employee business expenses.  XU
claimed that he was required to purchase a "back up" weapon as
part of his employment with CBP and provided the receipt to
support his claim of $1,500 in unreimbursed employee business
expenses.  Thus, because the eTrace record shows that XU
actually purchased the Sig Sauer 5.56 Caliber NATO rifle bearing
serial number JT007064 on December 4, 2009, it is likely XU
altered the date of sale on the handwritten receipt he provided
to IRS personnel during his 2013 income tax audit and that the
FBI retrieved on March 15, 2017.

[6] "Crossroads AZ" is likely a reference to Crossroads of the
West, a traveling gun show where individuals can purchase
firearms from FFLs and private parties.

57. According to my review of ATF reports, my conversations with the UCE, and a surreptitious audio recording the UCE made, I learned the following:

a. At approximately 4:20 p.m. on August 12, 2018, the UCE arrived at the parking lot of the FFL in Cerritos, California, and walked over to XU's vehicle, SUBJECT VEHICLE ONE.

b. After exchanging greetings, XU stated that he wanted to show the UCE something, and opened the trunk of SUBJECT VEHICLE ONE to reveal a printout from an Internet website for a "Polish PPS-43 Parts Kit" on sale for $74.95 and a soft protective rifle case. XU told the UCE that he brought the semi-automatic PPS-43 for the UCE to purchase and that the UCE would need the parts kit if the UCE wanted to convert the PPS-43 rifle into a fully-automatic firearm. XU first offered to sell the UCE the "PPS 43" in the list of firearms XU sent the UCE on July 6, 2018. A "Parts Kit" is a tool kit, commonly sold online, that allows a user to convert semi-automatic firearms into fully automatic firearms.

c. XU showed the PPS-43 rifle to the UCE and explained, while physically manipulating the firearm, how to convert the PPS-43 into a fully automatic firearm.

d. XU told the UCE that the PPS-43 was a "pistol" but that the UCE could easily convert the "pistol" into a "rifle" by removing a non-permanent bolt from the stock of the pistol and changing the trigger grip. XU stated, "It's very simple. Just pull it out and change the bolt here." XU

42

advised, "Right now it's legal as is . . . as a pistol. But if you want to take to the desert, that's fine. If you want to take it and leave it at home, just take the parts out . . . that means it's not a pistol."

e.  I know based on my inspection of the PPS-43 that XU later sold to the UCE on August 21, 2018, and my training and experience, that the PPS-43 XU showed to the UCE (and later sold to him as detailed below) was configured to be a short-barrel rifle. As detailed above, it is illegal under Federal law to possess or sell a rifle with a barrel measuring less than 16 inches that is not registered with the ATF. As XU explained to the UCE, the PPS-43 rifle did not have a permanent restriction preventing the stock of the rifle from unfolding and XU cautioned the UCE not to let anyone see him use the short-barreled rifle, as it would get the UCE in trouble.

f.  The UCE explained that he had only brought enough money to purchase the MSAR rifle they had previously discussed, but asked XU to hold on to the PPS-43 rifle, and XU agreed to do so.

g.  XU then initiated a conversation about high-capacity magazines. XU stated that he had AR-15-type high-capacity magazines with him inside the vehicle. I know from my training and experience that AR-15-type high-capacity magazines typically hold 30 rounds of ammunition and that, under California law, it is illegal to possess or transfer magazines that hold more than ten rounds of ammunition in California, unless the individual is exempted from the prohibition, as in

this case, by virtue of being a law enforcement officer. XU
showed the UCE several high-capacity magazines inside a box in
XU's trunk. XU stated, "But I can't transfer it [AR-15 high-
capability magazines] cause it's not legal to sell magazines
here." However, XU first stated that if the UCE brought a
"block or something" to restrict the capacity of the magazines,
XU could sell him the magazines. I know from my training and
experience that high-capacity magazines can be rendered
California compliant by inserting a "block" or object that
restricts the maximum number of rounds the magazines can hold to
ten.

      h.    After a few minutes, however, XU said he would be
willing to sell the high-capacity magazines to the UCE "as is,"
stating "No, I, I don't mind to be honest. . . Like I said
already, I only deal with people that I know, you know? We
don't want to get in trouble." XU agreed to sell five high-
capacity magazines for a total of $100.

      i.    While XU and the UCE engaged in small talk, XU
stated that he works in the auto parts business.

      j.    XU and the UCE then began discussing the MSAR
rifle that XU had previously arranged to sell to the UCE. XU
then showed the UCE a box marked "MSAR" in red lettering, and
opened the box to reveal an MSAR rifle and high-capacity
magazines. XU stated that MSAR rifle was brand new and easy to
convert into a fully- automatic rifle.

      k.    The UCE provided XU $2,100 in cash and took
possession of the MSAR rifle and five high-capacity magazines.

l.      Following the transfer, XU stated, "We are like drug dealers." While pointing to the PPS-43 short-barreled rifle, XU stated that "this will be the next one, because it is cheap . . . and very easy to convert." XU explained that "You cannot buy it in California [and] it is not on the California roster either." XU claimed to have purchased it in Arizona several years before. XU and the UCE exchanged goodbyes and left the parking lot.

m.      At no time did XU or the UCE enter the FFL to complete the DROS paperwork for the transfer of the MSAR rifle, as required by Federal and California law.

n.      Following the exchange, ATF inspected the MSAR rifle and determined that it was a model STG-556, .223 caliber rifle, bearing the serial number 600-P001488, and determined that it would be classified under California law as an "assault weapon." Under California law, it is illegal to possess or transfer an unregistered assault weapon. According to AFS records I reviewed, XU has no assault weapon registered to him.

> d.      *On August 21, 2018, XU Sells a Short-Barreled Rifle and High-Capacity Magazines to the UCE*

58.      On August 13, 2018, the UCE sent XU's Cellular Telephone a text message inquiring about the short-barreled PPS-43 rifle XU had shown and offered to sell to the UCE on August 12, 2018. XU and the UCE arranged to meet on August 21, 2018 in the parking lot of the FFL in Cerritos, California, and agreed to a negotiated price of $800.

45

59. According to my review of ATF reports, my conversations with the UCE, and a surreptitious audio recording the UCE made, I learned the following:

    a. At approximately 5:00 p.m. on August 21, 2018, the UCE arrived at the FFL parking lot and observed XU in the driver's seat of SUBJECT VEHICLE TWO.

    b. After exchanging greetings, XU opened the trunk of SUBJECT VEHICLE TWO and revealed the short-barreled PPS-443 rifle XU previously showed the UCE on August 12, 2018. XU again showed the UCE how to convert the short-barreled rifle into a fully-automatic firearm by removing the pin that blocks the trigger mechanism from firing automatically. XU explained "Like I said, this is very simple. If you have the stock folding it's a pistol . . . . It's okay. If you pull the stock open – it's called a short barrel rifle. . . . It can be folded . . . . It can be unfolded." Manipulating the rifle, XU stated, "little tabs just cut if off. That's it. It's, uh, it will unfold . . . . It's so simple."

    c. XU advised the UCE not to unfold the rifle in public, "don't get yourself in trouble," but that he could unfold the short-barreled rifle in the desert.

    d. XU further advised that if the UCE wanted to convert the firearm into fully-automatic and shoot it, he would need to unfold the stock, "you shoot full auto you need a stock to hold it . . . otherwise it's going to shake too much."

    e. The UCE provided XU with $800 in cash for the short-barreled rifle.

f.    XU also asked if the UCE wanted additional high-capacity magazines.  XU stated that he had a friend coming from Arizona the following month and he could get the UCE additional high-capacity magazines if the UCE wanted.  XU stated that he had three high-capacity magazines on him and would sell them to the UCE for $58.  The UCE provided XU with $60.  XU did not return the $2 difference as UCE told XU to keep it.

g.    XU placed the short-barreled rifle and the three high-capacity magazines in the UCE's trunk.  XU stated, "So, don't, don't get yourself in trouble because the magazines, it's high cap, that's why I set it.  Yeah, so don't go to the public range."  XU and the UCE exchanged goodbyes.

h.    At no time did XU and the UCE enter an FFL to record the PPT as required by California law.

i.    ATF queried the National Firearms Registration and Transfer Record and found that the short-barreled PPS-43 rifle was not registered as required by the National Firearms Act.  ATF further determined that XU does not have any firearms registered in the National Firearms Registration and Transfer Record.

j.    Following the sale, the ATF determined that the firearm was a Wise Lite Arms Inc., model PPS43, 7.62x25 caliber rifle bearing the serial number WLA27-502.  The rifle stock was extendable and the barrel measured only 11 inches in length. The ATF further determined that the firearm XU sold to the UCE on August 21, 2018, was a short-barreled rifle that is illegal

47

under federal law to possess or transfer, unless the rifle is registered.

### D.   XU and Li Failed to Report Income on Their Tax Returns

#### 1.   Applicable Statutes

60.   18 U.S.C. § 287 states as follows:

Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine in the amount provided in this title.

61.   18 U.S.C. § 286 states as follows:

Whoever enters into any agreement, combination, or conspiracy to defraud the United States, or any department or agency thereof, by obtaining or aiding to obtain the payment or allowance of any false, fictitious or fraudulent claim, shall be fined under this title or imprisoned not more than ten years, or both.

62.   The relevant portion of 18 U.S.C. § 641 is as follows:

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or

Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—

Shall be fined under this title or imprisoned not more than ten years, or both

63.   The relevant portion of 18 U.S.C. § 1341 is as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

64. The relevant portion of 18 U.S.C. § 1343 is as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

65. 26 U.S.C. § 7201 states as follows:

Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution.

66. The relevant portions of 26 U.S.C. §§ 7206(1) and (2) states as follows:

Any person who—

(1) Declaration under penalties of perjury: Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter; or

(2) Aid or assistance: Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document;

shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 3 years, or both, together with the costs of prosecution.

67.    Under the Bank Secrecy Act, individuals who hold a financial interest in or signatory authority over one or more accounts in foreign countries with an aggregate value in excess of $10,000 at any time during the calendar year are required to file Reports of Foreign Bank and Financial Accounts (FBARs) (Treasury Form 90-22.1) disclosing their interests in these accounts.   31 U.S.C. §§ 5314 and 5322, and 31 C.F.R. § 1010.350.   During the period at issue in this investigation, these reports were required to be filed with FinCen on or before June 30th of the calendar year following the year in which the foreign bank accounts exceeding $10,000 were held by the taxpayer.   Under 31 U.S.C. § 5322, a taxpayer who willfully

fails to comply with these reporting requirements is guilty of a felony.

## 2. Income and Reporting Requirements

68. For the years 2013 through 2017, pursuant to 26 U.S.C. § 61, gross income meant all income from whatever source derived, including (but not limited to), gross income derived from a business (26 U.S.C. § 61(a)(2)), gains derived from dealings in real property (26 U.S.C. § 61(a)(3)), and rents received (26 U.S.C. § 61(a)(5)). Gross income is used in the computation of total income, pursuant to 26 U.S.C. § 63, which is taxable under federal law, and must be reported on a taxpayer's individual income tax return, generally in the year that the income is earned by the taxpayer.

69. The IRS required taxpayers to report income received on various categories on page 1 of the Form 1040, U.S. Individual Income Tax Return for years 2013 through 2017 (i.e., wages, taxable interest, dividends, rents, social security benefits). In the event that income received does not fit into an enumerated category on page 1 of the Form 1040, the IRS required a taxpayer to report the uncategorized income as "other" income.

70. The IRS prescribes certain schedules that are attached to and filed with a taxpayer's income tax return to report and incorporate various types of income received (and conversely, expenses, credits, and deductions claimed) for tax years 2013 through 2017.

a.  Income (or loss) from a sole proprietor business is reported on a Schedule C, entitled "Profit or Loss From Business."  When filing a Schedule C, a taxpayer must list the name and address of the business, the type of business engaged, the gross receipts/sales earned, the cost of goods sold by the business, and any expenses paid to operate the business.  Then, on the Schedule C, the business expenses incurred by the taxpayer is subtracted from the business income received by the taxpayer to determine the total net profit or loss from the business, which amount is then reported on the taxpayer's Form 1040, page 1.  An activity qualifies as a business if the taxpayer's primary purpose for engaging in the activity is for income or profit and the taxpayer is involved in the activity with continuity and regularity.  Pursuant to federal law, "gross receipts" are the total amounts a business received from all sources during its annual accounting period, without subtracting any costs or expenses, and "gross sales" are the total amounts a business received based on the total sales price of reported inventory sold.

b.  Income (or loss) from the sale of property (not a personal residence) is reported on a Schedule D, entitled "Capital Gains and Losses."  When filing a Schedule D to report the sale of property during a tax year, a taxpayer must report the proceeds from the sale, their cost to purchase the property, and other adjustments.  Then, on the Schedule D, the purchase price of the property is subtracted from the sale price of the property to determine if the sale of the property generated a

capital gain or loss, which amount is then reported on the
taxpayer's Form 1040, page 1.

      c.   Income (or loss) from the rental of real estate
is reported on a Schedule E, entitled "Supplemental Income and
Loss." When filing a Schedule E to report the rental of a
property during a tax year, a taxpayer must list the address of
the property, report the total amount of rents received from
tenants, and itemize any expenses paid. Then, on the Schedule
E, the rental expenses incurred by the taxpayer are subtracted
from the rental income received by the taxpayer to determine the
total rental real estate income (or loss), which amount is then
reported on the taxpayer's Form 1040, page 1. Other income/loss
is reported on Schedule E, including income/loss from a
taxpayer's partnership interest or as a shareholder in a S-
corporation, which amount is also totaled and reported on the
taxpayer's Form 1040, page 1.

      d.   On Schedule B, Interest and Ordinary Dividends,
from at least 2011 to 2017, if a taxpayer had a foreign account,
the taxpayer was required to answer questions pertinent to that
account on said schedule, including, but not limited to, if the
taxpayer had a financial interest in or signature authority over
a financial account, such as a bank account, securities account
or brokerage account, located in a foreign country.

      e.   On page 1 of the Form 1040 for 2013 through 2017,
a taxpayer's income is determined. On page 2, the amount of tax
on the aforementioned income of a taxpayer is determined. Also
on page 2 certain deductions, exemptions, and credits are

claimed, which effect the amount of tax owed on the taxpayer's income. Not reporting income directly affects the amount of tax reported on the Form 1040 and owed by the taxpayer to the IRS.

3.   XU and Li's Family, Corporation, and Associates

71.   XU and Li, who were married in 2002 according to their "A-Files" maintained by USCIS, have filed timely (on or before April 15 of the subsequent year) income tax returns since 2011 using the "married filing joint" filing status.

72.   Beginning in 1996, XU and Tan[7] operated CAP and TPG. Based on a search of IRS records available to date, CAP has never filed a business income tax return with the IRS. Likewise, Tan has never filed an individual income tax return with the IRS.

73.   IRS records for TPG show that the company has elected to be taxed as a small business corporation ("S-Corporation") with profit and loss items flowing through to its underlying shareholders.  I have reviewed corporate income tax returns, and related schedules, filed by TPG for the years 2008 through 2017, including K-1 schedules identifying the corporation's underlying shareholders.  K-1 Schedules filed by TPG list XU as the company's sole shareholder between 2008 and 2012 and Li as the company's sole shareholder between 2013 and 2017.  XU and Li claimed flow-through losses from their ownership interest in TPG

---

[7] As mentioned above, Tan is a business associate of XU. According to public records available on the Florida Department of State website on March 23, 2017 which I reviewed, XU and Tan were members of the Board of Directors of China Auto Parts, when the company filed its Articles of Incorporation with the State of Florida on or around December 13, 1996.

54

on their joint returns for the years 2011 through 2017.  The losses were reported on Schedule E, Statement of Supplemental Income and Loss, included with each return.

### 4.   XU and Li's Bank Accounts

74.   Based on bank records I have reviewed, in November 30, 1996, XU and Tan opened a First Union Bank checking account with an account number ending in 8901 in Florida.  I know from open-source information that in 2001, Wachovia Bank merged with First Union Bank and in 2010, Wachovia Bank was purchased by Wells Fargo Bank.  The records show that XU and Tan still maintain a checking account ending 8901 with Wells Fargo Bank, and monthly bank account statements are sent to XU at the SUBJECT RESIDENCE.

75.  Based on Wells Fargo bank records I have reviewed, XU owns a Wells Fargo bank account ending 9791, which was once held with Wachovia Bank.  Wachovia Bank documents I reviewed show that in 2007, XU listed this account as a "Crown Banking" account.  Wells Fargo monthly accounts statements show that between July 2007 and June 2013, Wang and a second person, whose relationship to XU has yet to be identified, were added as signatories onto this account in addition to XU.

76.   Based on bank records I have reviewed, in March 2009, XU opened a bank account ending 2845 with United Central Bank with Li.  Based on a review of open source material, in 2014, Union Central Bank was acquired by Hanmi Bank.  In October 2016, the account was closed.

77. Based on Wells Fargo bank records I have reviewed, XU and Li own a Wells Fargo bank checking account ending 3582, which they opened on May 20, 2015.

### 5. XU's Income from the Sale of Firearms

78. As enumerated above, beginning in at least 2014, XU purchased firearms and resold them to third-parties with regularity. Based on the records I have reviewed, XU earned income from the sale of firearms that he was required to report to the IRS on the Forms 1040 he filed, but failed to do so.

79. Based on the information received from PROVIDER TWO and my review of XU's bank records, XU received cash for the firearms he sold to third parties, some of which he deposited into his bank accounts, typically the same day he sold the firearm. Specifically, I found the following firearm sales and corresponding bank account deposits:

a. Based on AFS records I reviewed, on April 29, 2014, XU purchased a Beretta M9A1 9mm pistol at a firearms dealer in Artesia. On May 9, 2014, XU sold the firearm to a third-party. According to XU's bank records, on the same day, XU made three ATM cash deposits that totaled $530 into his Wells Fargo account ending 9791 and made one cash deposit of $400 into his Hanmi Bank account ending 2845.

b. On May 20, 2015, XU purchased a Glock 43 9mm pistol, which he sold to a third-party on June 12, 2015. On June 12, 2015, XU made two deposits into his Wells Fargo bank account ending 9791: 1) "Edeposit in a branch/store" of $2,400 and 2) ATM cash deposit of $1,000.

c.    On May 29, 2014, XU purchased a Glock 17 9mm pistol which he sold a year later to a third party on June 19, 2015.  On June 20, 2015, XU made 3 ATM cash deposits into his Wells Fargo account ending 9791 for a total of $1,000.

d.    On April 18, 2014, XU sold a firearm to a third-party and on the same day, he made a $1,000 deposit into his Hanmi Bank account ending 2845.

### 6.    XU's Rental of the Norwalk Condo

80.    Based on my review of property records, employment records, income tax returns, and surveillance, XU and Li currently live in the SUBJECT RESIDENCE, and own other single-family residences, including the Norwalk Condo and the Elderberry Residence.

81.    Based on my review of the grant deed filed with the Los Angeles County Recorder's Office, the Norwalk Condo is deeded in XU's name only, as a married man, and was purchased on or around December 30, 2004.  As stated above, and based on my review of past income tax returns and bank account statements, XU lived in the Norwalk Condo beginning at the time of purchase and Li lived in the Norwalk Condo upon her move to the United States.

82.    In May 2013, XU purchased the SUBJECT RESIDENCE, where he and Li moved.  Though the grant deed to the SUBJECT RESIDENCE is in XU's name only, as "a married man as his sole and separate property," on May 8, 2013, the same day the grant deed of the SUBJECT RESIDENCE was recorded, Li also recorded an Interspousal Transfer Grant Deed with the Los Angeles County Recorder's

Office, that gave XU all rights, title, and interest of Li, community or otherwise, of the SUBJECT RESIDENCE, as XU's sole and separate property.

83. According to bank records and income tax returns I have reviewed, XU began renting the Norwalk Condo to tenants in June 2013.

a. Bank records show that, from 2013 to 2017, the Norwalk Condo was rented by two individuals, Tenant One and Tenant Two.[8]

b. Based on my review of XU's bank account statements, XU received money (either by check or electronic transfer) for rent of the Norwalk Condo from Tenant One and Tenant Two, which were deposited into one of the three above-mentioned bank accounts owned by XU with Wells Fargo or Hanmi banks. Many of the checks or electronic deposits made by Tenant One and Tenant Two are identified as payment for rent of the Norwalk Condo in the bank statements or on the face of the checks.

c. Based on my review of XU's bank records, Tenant One rented the Norwalk Condo from on or about June 2013 through July 2014, and paid XU monthly rent of $1,800 by check. From examining the rent checks, it appears that XU endorsed Tenant One's checks. Tenant One's checks were deposited into XU's accounts ending 9791 or 2845. Tenant One made the checks payable to XU, marked the memo section of each check "Rent" and,

---

[8] I have not included the renters' names to protect their privacy.

on four occasions, also included the Norwalk Condo address in the memo section of the check.

       d.   XU's bank records show that beginning on September 2, 2014, Tenant Two began paying XU rent by mobile phone transactions, where funds were electronically transferred from Tenant Two to XU's account ending 8901. Wells Fargo monthly bank account statements show the receipt of this income to XU's account, which the bank statement's transaction line identifies as "Rent via Mobile."

    84.   Pursuant to a search warrant issued on July 13, 2017 by United States Magistrate Judge Patrick J. Walsh, 2:17-MJ-1725, I reviewed e-mails from XU's Yahoo accounts, the CHINA AUTO PARTS SUBJECT ACCOUNT and the TRANS PACIFIC GROUP SUBJECT ACCOUNT, that also show XU rented the Norwalk Condo a tenant. For example, on August 15, 2014, XU emailed Tenant Two, listed the subject as "Wells Fargo Account for rent," and provided Tenant Two his Wells Fargo bank account number ending 8901 for Tenant Two to deposit rent.

    85.   Based on my review of bank records, the following chart shows the amount of income XU earned through the rental of the Norwalk Condo by year:

| Year | Tenant | Annual Amount of Rent Paid to XU |
|------|--------|----------------------------------|
| 2013 | Tenant One | $10,800 |
| 2014 | Tenant One and Two | $19,826 |
| 2015 | Tenant Two | $21,374 |
| 2016 | Tenant Two | $18,751 |

| Year | Tenant | Annual Amount of Rent Paid to XU |
|---|---|---|
| 2017 | Tenant Two | $180 |
| Total | | $70,931.00 |

86. As described above, XU sold the Norwalk Condo on or around February 8, 2017 to an unrelated third-party.

### 7. Rental of the Elderberry Residence

87. According to bank records I reviewed, from November 2015 through at least September 2018, XU and/or Li rented the Elderberry Residence to a tenant.

88. Based on my review of Wells Fargo bank records for the account ending 3582, from 2015 to 2017, the Elderberry Residence was rented by one individual, Tenant Three, and XU and Li's account received money by ACH transfer for the rent. Specifically, Tenant Three rented the Elderberry Residence from November 12, 2015 through at least December 1, 2017, and paid Li monthly rent of $2,400 by ACH deposit from Tenant Three's account, with the payee listed as Li. The following chart shows the amount of income XU and Li earned through the rental of the Elderberry Residence by year:

| Year | Annual Amount of Rent Paid by Tenant Three |
|---|---|
| 2015 | $4,800 |
| 2016 | $26,400 |
| 2017 | $28,800 |
| Total | $60,000.00 |

8.   XU and Li's Tax Returns for 2013 through 2017

89.   Since 2013, XU and Li have timely filed income tax returns with the IRS electronically.

90.   For the 2013 through 2016 tax years, an income tax return preparer, J.Y., of ABF Tax and Accounting Services in Monterey Park, California, was listed as having prepared the returns.

91.   The 2017 joint federal income tax return of XU and Li does not indicate that it was prepared by a third-party return preparer. I have reviewed Internet Protocol address ("IP address") records maintained by the IRS for the 2017 joint federal income tax return of XU and Li that show the return was filed from an IP address associated with the Department of Homeland Security, the parent agency of XU's employer, CBP.

92.   Records obtained by the July 13, 2017 search warrant for XU's CHINA AUTO PARTS and TRANS PACIFIC SUBJECT ACCOUNTS referenced above show:

a.   XU's CHINA AUTO PARTS and TRANS PACIFIC SUBJECT ACCOUNTS contained numerous emails between XU and J.Y. discussing the preparation of XU's 2014 through 2016 income tax returns.

b.   XU provided J.Y. by fax or email supporting documents (Forms W-2, 1098, etc.) or spreadsheets (for "law enforcement expenses") XU created for J.Y. to use to prepare the returns. Each year, XU provided the pertinent tax information and specific amounts to J.Y., who input whatever XU told him to claim/deduct on each year's returns.

61

c.    After the transmission of the supporting documents, XU and J.Y. typically met in person to review the returns.  In some years, it appears from the email exchanges between the two that after the appointment, XU again reviewed the returns himself, and thereafter, emailed J.Y. and authorized him to e-file the returns.

d.    Based on my review of the search warrant returns, J.Y. and Li did not communicate by email.

93.    I have reviewed the returns in the name of XU and Li filed with the IRS that were either prepared by J.Y. (for 2014-16) or self-prepared (2017) and learned the following:

a.    Regarding XU's activity relating to selling firearms, on XU's 2014 through 2017 income tax returns, XU did not report any income with respect to the sale of any firearm.

b.    Regarding the Norwalk Condo, initially, XU did report the rental of the property to the IRS.  On his 2013 income tax return, XU reported the Norwalk Condo was rented in said year, that he received rents of $6,000, and claimed expenses of $25,705.  However, based on an analysis of bank records, XU failed to report all of the rental income received from Tenant One in 2013, $10,800.  The mortgage interest paid in 2013 on the Norwalk Condo was partially deducted on XU's Schedule A, to reflect home mortgage interest paid while XU and Li resided in the property, and on Schedule E, to reflect mortgage interest paid while XU rented the property to Tenant One.

c. However, despite continuing to rent the Norwalk Condo in 2014 through January 2017 and receiving rent by checks or electronic transfers deposited into his bank accounts from Tenants One or Two, XU never reported any Schedule E rental income on the property to the IRS.

d. Regarding the Elderberry Residence, despite receiving ACH transfers deposited into the Wells Fargo bank account ending 3582 in 2015 through 2017, XU and/or Li never reported any Schedule E rental income on the property to the IRS from Tenant Three.

e. On the 2014 through 2017 tax returns for XU and Li, Schedules E were filed that reported losses for their interests in TPC, but in the section on that same schedule, the income from rents they received of the Norwalk Condo or the Elderberry Property was never reported. However, on XU and Li's 2014 through 2017 income tax returns, the amount paid towards the Norwalk Condo's home mortgage interest is deducted on the Schedule A filed with the income tax returns, as if the Norwalk Condo was XU's primary residence and not rented. However, from the income tax returns and bank records I have reviewed, in 2014 through 2017, XU and Li lived in the SUBJECT RESIDENCE and rented the Norwalk Condo.

94. Based on IRS records I have reviewed, XU has never filed a Report of Foreign Bank and Financial Accounts (FBARs) (Treasury Form 90-22.1). On Schedules B filed with the IRS with his income tax returns, when asked if XU or Li has a financial interest in or signatory authority over a financial account

located in a foreign country, the answer was left blank (2011, 2013, 2015, 2016), or answered as "NO" (2012, 2014, 2017).

95.    Based on the evidence I have reviewed during this investigation, from XU's bank records and tax returns, and the AFS system records, emails, and other evidence, I believe probable cause exists that in 2014 through 2017, XU earned income from the sale of firearms that he was required to report to the IRS, which he failed to do.  For the same reasons, I believe that in 2013 through 2017, XU earned income from the rental of the Norwalk Condo that he was required to report to the IRS, which he failed to do.  I also believe probable cause exists that in 2015 through 2017, XU and/or Li earned income from the rental of the Elderberry Residence that XU and Li were required to report to the IRS, which they failed to do.  I believe probable cause exists that in 2017, capital gains income or loss was incurred by the sale of the Norwalk Condo, which Xu was required to report to the IRS but failed to do.  I believe probable cause exists that since at least 2002, XU had a foreign account in China.

## E.    ADDITIONAL INFORMATION REGARDING THE PREMISES TO BE SEARCHED

### 1.    The SUBJECT RESIDENCE

96.    As part of its investigation, FBI personnel examined trash discarded from the SUBJECT RESIDENCE on a near weekly basis, beginning on March 2, 2017 and as recently as January 31, 2019.  Based upon my review of those materials and my

conversations with other FBI agents investigating this case, I have learned the following:

a.   XU and Li are the only people who reside at the SUBJECT RESIDENCE. (FBI surveillance also confirmed this).

b.   FBI personnel retrieved financial records, deposit and withdrawal receipts, ATM records, wire transfer receipts, bank account information, handwritten accounting notes, and tax documents discarded periodically from the SUBJECT RESIDENCE related to XU's import businesses, CAP and TPG. For instance, on March 2, 2017, FBI personnel retrieved discarded mail from Chase Bank addressed to "Wei Xu" at the both the Norwalk Condo and XU's former residence in Chino Hills, California, regarding XU's CAP business account and credit card. FBI personnel also retrieved discarded mail addressed to XU at the SUBJECT RESIDENCE regarding TPG, such as a letter from Wells Fargo Bank regarding a business line of credit pre-qualification letter, dated May 2, 2016, addressed to "Wei Xu, Transpacific Group Inc." at the SUBJECT RESIDENCE. In addition, FBI personnel retrieved deposit records and wire transfer receipts documenting payments made between CAP and TPG and foreign-owned businesses and financial institutions.

c.   FBI personnel also retrieved financial records from the American subsidiaries of Chinese financial institutions. For example, the FBI retrieved a receipt showing that an unidentified person made a $62,795.86 USD deposit into an account ending in 3036 at the San Gabriel, California branch location of the Industrial and Commercial Bank of China ("ICBC")

a United States subsidiary on February 27, 2018.   Another
receipt addressed to Li at the SUBJECT RESIDENCE showed that on
January 27, 2017, a deposit in the amount of $29,498.23 was made
into the same account ending in 3036.   On September 9, 2018, the
FBI recovered a discarded Wells Fargo wire transfer notice for
$15,000 from XU and Li's account ending 3582 to Liu's Bank of
China account ending 0163 dated August 25, 2018.

    d.   FBI personnel retrieved discarded printouts of
electronic communications between XU and business associates
regarding CAP and TPG.   For example, on May 31, 2018, FBI
personnel retrieved a printed email from
dated January 17, 2018, to XU at the CHINA AUTO PARTS SUBJECT
ACCOUNT regarding invoices and payment details.

    e.   FBI personnel retrieved records and receipts of
firearm purchases, orders, sales and transfers made in XU and
Li's names at locations in California and Arizona.

    f.   FBI personnel retrieved discarded handwritten
monthly expense journals, likely used in accounting and tax
preparation.   For example, on January 17, 2018, the FBI
retrieved handwritten monthly expense journals for tax years
2007 through 2017, and on May 31, 2018, an accounting document
entitled "2017 Law Enforcement Expenses."

    g.   FBI personnel also retrieved discarded mail and
records related to the Elderberry Residence.   For example, on
January 3, 2018, FBI personnel retrieved a Home Owners
Association dues letter for $110 from December 1, 2017 to
January 1, 2018 regarding Li's property located at the

66

Elderberry Residence.  The letter was address to Li and Liu.

h.  FBI personnel also retrieved mail addressed to individuals at the SUBJECT RESIDENCE other than XU and Li, such as a letter addressed to Liu and a Wells Fargo credit card offer that was mailed to Tan, both addressed to the SUBJECT RESIDENCE.

2.  The SUBJECT VEHICLES

97.  Based on my conversation with ATF Special Agents and review of the video recordings of the UCE'S meetings with XU described above, XU transported firearms, ammunition, and gun parts and accessories in the SUBJECT VEHICLES when XU met the UCE and sold the UCE firearms and high-capacity magazines on July 6, 2018, July 12, 2018, August 12, 2018, and August 21, 2018.  During these meetings, XU retrieved firearms and high-capacity magazines from the SUBJECT VEHICLES and the trunks of the SUBJECT VEHICLES and the UCE observed additional firearms, magazines, and gun parts and accessories in the SUBJECT VEHICLES during the meet.  XU also retrieved a printout from an Internet website showing a parts kit to modify one of the firearms XU sold to the UCE on August 21, 2018 from SUBJECT VEHICLE ONE.  Following the sale of the firearms to the UCE, XU return to the SUBJECT VEHICLES with the cash the UCE provided him.

3.  XU'S SAFETY DEPOSIT BOX

98.  Based on records received from Wells Fargo, XU leases a safety-deposit box, number _____ from a Wells Fargo branch located at _____ Cerritos, CA _____ XU is the only person authorized to access the safety-deposit box and

67

has done so on two occasions - December 22, 2012 and February 22, 2013.

99. Based on my training and experience, I know that people often maintain safety-deposit boxes to store important documents such as birth certificates, deeds, tax returns, travel documents, financial records, and cash. In addition, because commercial banks do not inspect the contents of the safety-deposit boxes and have limited responsibly to report suspicious behavior, persons engaged in criminal conduct often use safety-deposit boxes to store evidence or fruits of their crimes. As a result, and based on the totality of the facts described in this affidavit, there is probable cause to believe XU's safety-deposit box contains such records and evidence.

F. **ADDITIONAL INFORMATION REGARDING THE SUBJECT ACCOUNTS**

1. CHINA AUTO PARTS AND TRANSPACIFIC GROUP SUBJECT ACCOUNTS

100. As an initial matter, I note that the e-mail addresses of the CHINA AUTO PARTS AND TRANSPACIFIC GROUP SUBJECT ACCOUNTS contain the initials of the corresponding company names, and XU's last name. The address of the CHINA AUTO PARTS SUBJECT ACCOUNT begins with the letters          followed by
followed by          The address of the TRANS PACIFIC GROUP SUBJECT ACCOUNT begins with the letters          followed by

101. According to subscriber records from PROVIDER ONE, "Mr wei xu" created the CHINA AUTO PARTS SUBJECT ACCOUNT on February 5, 2001, and registered the account using XU's Cellular Telephone, the TRANS PACIFIC GROUP SUBJECT ACCOUNT, a

68

registration location of Altamonte Springs, Florida, and a date
of birth one day earlier than XU's date of birth as listed in
California DMV records. In addition, as described above, XU
reported that he lived at                          Altamonte
Springs, Florida in immigration documents and both CAP and TPG
listed the same address in the documents filed with the Florida
Secretary of State.

102. According to subscriber records from PROVIDER ONE, "Mr
George Xu" created the TRANS PACIFIC GROUP SUBJECT ACCOUNT on
August 12, 2003, and registered the account using XU's Cellular
Telephone, and a registration location of La Verne, California.
On XU's on March 15, 2003 and August 30, 2011 SF-86 Forms, XU
stated that he was employed by HTI Technologies and Industries
from September 2002 through September 2004, in La Verne,
California.

103. On July 13, 2017, the Honorable Patrick J. Walsh,
United States Magistrate Judge for the Central District of
California, issued a warrant, 2:17-MJ-1725, authorizing the FBI
to search and seize information associated with the CHINA AUTO
PARTS and TRANS PACIFIC GROUP SUBJECT ACCOUNTS for evidence,
contraband, fruits, or instrumentalities of criminal violations
of 18 U.S.C. § 1001(a) (False Statements to Government Agency).
In those accounts, the FBI found hundreds of e-mails documenting
XU's operation of CAP's and TPG's business. Specifically, the
FBI seized e-mails authored by XU from both accounts in which XU
ordered auto part shipments from his associate Tan in China,
sent and requested invoices, and prepared shipments and

receipts. The FBI also found emails regarding the SUBJECT RESIDENCE, the Norwalk Condo, and the Elderberry Residence, including communications regarding the purchase of the residences. The FBI also retrieved e-mail correspondence between XU and his tax preparer, J.Y., discussing the preparation of XU's personal and corporate tax filings, as well as finical records from banking intuitions, such as notifications of wire transfers.

2. ████████ 73 SUBJECT ACCOUNT

104. According to subscriber records from PROVIDER ONE, the ████████ 73 SUBJECT ACCOUNT was registered to "Gigi Li" on May 22, 2011, using XU's Cellular Telephone. As mentioned above, Verizon Wireless records show that XU's Cellular Telephone is registered to XU at the SUBJECT RESIDENCE, where XU and Li reside. Based on my investigation, "Gigi Li" is a nickname Li uses.

105. During the above-mentioned FBI's search of the CHINA AUTO PARTS and TRANS PACIFIC GROUP SUBJECT ACCOUNTS, the FBI seized e-mails sent from the those accounts that copied ("cc'd") the ████████ 73 SUBJECT ACCOUNT. The e-mails show that XU is likely the true operator of the ████████ 73 SUBJECT ACCOUNT even though the e-mail address was created using Li's full name – ████████ 73" – and was registered in Li's nick-name – Gigi Li.

106. The e-mails retrieved from the search of the CHINA AUTO PARTS and TRANS PACIFIC GROUP SUBJECT ACCOUNTS, suggest that XU was the author of and intended recipient of e-mails from and sent to the ████████ 73 SUBJECT ACCOUNT. For example, a June

70

24, 2015 e-mail to the ▇▇▇▇ 73 SUBJECT ACCOUNT, with the subject line "Elderberry Lane – Escrow," which cc'd the CHINA AUTO PARTS SUBJECT ACCOUNT, begins "Hello Wade." Another e-mail from the ▇▇▇▇ 73 SUBJECT ACCOUNT to a relator that copied the CHINA AUTO PARTS SUBJECT ACCOUNT, with a subject line "▇▇▇▇ ▇▇▇▇ Escrow #12274-AE," is signed, "Thank you, Wei Xu."

107. The FBI found only one e-mail signed by "Yanping," regarding a mortgage inquiry from Princeton Capital, a Residential Mortgage Lender; however, it is likely XU was impersonating Li in this exchange because XU authored all the other e-mails FBI seized and managed the purchase of the residences himself. Thus, based on the investigation conducted to date, it is likely XU operates the ▇▇▇▇ 73 SUBJECT ACCOUNT and has used the account to negotiate and finalize the purchase of real estate.

### 3.  PROVIDER TWO SUBJECT ACCOUNTS

108. According to subscriber records from the PROVIDER TWO, CALGUNS SUBJECT ACCOUNT ONE was created on August 26, 2012, with a registration date of birth of ▇▇▇▇▇▇▇▇ and a registration email of ▇▇▇▇▇▇▇▇ the TRANSPACIFIC GROUP SUBJECT ACCOUNT. California DMV records list XU's date of birth as ▇▇▇▇▇▇▇▇ one month later than the date listed in SUBJECT ACCOUNT ONE's registration. As described above, according to Yahoo subscriber records, the TRANSPACIFIC GROUP SUBJECT ACCOUNT – CALGUNS SUBJECT ACCOUNT ONE's registration email – was created by "George Xu" on August 12, 2003, with

71

registration telephone number ▮▮▮▮▮▮▮▮ – XU's Cellular
Telephone.

109. According to PROVIDER TWO subscriber records, CALGUNS
SUBJECT ACCOUNT TWO was created on September 14, 2014, with a
registration date of birth of ▮▮▮▮▮▮▮▮ and a registration
email of ▮▮▮▮73@yahoo.com – the ▮▮▮▮73 SUBJECT ACCOUNT.
California DMV records list Li's date of birth as ▮▮▮▮▮▮▮▮
– the same date of birth used to register CALGUNS SUBJECT
ACCOUNT TWO.  Although CALGUNS SUBJECT ACCOUNT TWO is registered
using an e-mail address in XU's wife's name, "Yanping Li," and
Li's date of birth, because CALGUNS SUBJECT ACCOUNT TWO is used
to facilitate firearms sales, AFS records show XU transferred
some of the firearms he discussed via the CALGUNS SUBJECT
ACCOUNT TWO, and because XU communicated with the UCE via this
account, there is probable cause to believe XU is the actual
operator of CALGUNS SUBJECT ACCOUNT TWO.[9]

110. On August 24, 2018, the Honorable Jean P. Rosenbluth,
United States Magistrate Judge for the Central District of
California, issued a warrant, 2:18-MJ-2248, authorizing the FBI
to search the CALGUNS SUBJECT ACCOUNTS and seize evidence,
contraband, fruits, or instrumentalities of criminal violations

---

[9] According to DROS records, Li is listed as the seller on
six PPT firearms transfers in 2017 and 2018.  Based on my
investigation and conversations with the UCE who observed Li
during XU's July 12, 2018 firearm sale to the UCE, it is likely
XU orchestrated and directed the sale of the six firearms and
may have used Li to circumvent California law, which restricts
the number of PPT transfers an individual may make to six in a
single calendar year.

of 18 U.S.C. § 922(a)(1)(A) (Dealing in Firearms Without A Federal Firearms License ("FFL")), 18 U.S.C. § 922(a)(3) (Transporting a Firearm Purchased in one State into a State of Residency), and 18 U.S.C. § 922(a)(6) (Providing False Information to an FFL During Acquisition of a Firearm (the "Subject Offenses").

111. In those accounts, the FBI found dozens of electronic communications showing that XU engaged in the business of dealing in firearms using the CALGUNS SUBJECT ACCOUNTS. Specifically, the FBI seized public advertisements, or posts, authored by XU from both accounts in which XU offered to sell or trade firearms. The FBI also retrieved dozens of private messages in which XU negotiated the sale price, meeting place, and logistics to finalize the sale of dozens of firearms. In many PMs, XU discussed federal and California state restrictions on firearm transfers and appeared highly knowledgeable about federal and state law. XU also referenced his status as a law enforcement officer ("LEO") in communications via the CALGUNS SUBJECT ACCOUNTS.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[10]

112. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[10] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

113. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult

to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.      Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

114. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.      Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.      In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the

opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress XU's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of XU's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

d. As set forth above, XU and Li reside at the SUBJECT RESIDENCE and XU operates multiple e-mail and social media accounts to facilitate CAP, TPG, and his unlawful firearms business. Moreover, XU appears to have impersonated Li and managed at least one e-mail account nominally operated by Li. In addition, according to travel records, Liu is currently visiting XU and Li and staying at the SUBJECT RESIDENCE. In my training and experience, digital devices found in residences like the SUBJECT RESIDENCE may not have a clearly identifiable user based on the exterior of the device and/or may have multiple users whose biometric features may unlock the devices because drug traffickers share digital devices on which to coordinate drug trafficking and the laundering of drug trafficking proceeds. Thus, if while executing the warrant, law enforcement personnel encounter a digital device within the scope of the warrant that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for

would permit law enforcement personnel to, with respect to XU,
Li, and Liu at the SUBJECT RESIDENCE during the execution of the
search: (1) depress the person's thumb- and/or fingers on the
device(s); and (2) hold the device(s) in front of the face of
the person with his or her eyes open to activate the facial-,
iris-, and/or retina-recognition feature.

## VII. CONCLUSION

115. For all the reasons described above, there is probable
cause to believe that evidence, contraband, fruits, or
instrumentalities of criminal violations of 18 U.S.C.
§ 922(a)(1)(A) (Dealing in Firearms Without A Federal Firearms
License), 18 U.S.C. § 922(a)(3) (Transporting a Firearm
Purchased in one State into a State of Residency), 18 U.S.C.
§ 922(a)(6) (Providing False Information to an FFL During
Acquisition of a Firearm), 26 U.S.C. § § 5861(d) and (e)
(Possession and Transfer of an Unregistered Short-Barreled
Rifle), 18 U.S.C. § 1001 (Making False Statements to A
Government Official), 26 U.S.C. § 7201 (Tax Evasion), 26 U.S.C.
§ 7206(1) (False Statements on a Tax Return), 26 U.S.C. §
7206(2) (Aiding or Assisting in the Preparation of False Tax
Returns, 18 U.S.C. § 287 (False Claims Against the Government),
18 U.S.C. § 286 (Conspiracy to Defraud the Government with
Respect to Claims), 18 U.S.C. § 641 (Theft of Public Money), 18
U.S.C. §§ 1341, 1343 (Mail and Wire Fraud), and 31 U.S.C. §§

5314 and 5322, and 31 C.F.R. § 1010.350 (Failure to File an FBAR) as described above and in Attachment B-1 through B-3 of this affidavit, will be found in a search of the SUBJECT PREMISES, as further described above and in Attachment A-1 through A-3 of this affidavit.

_____
JEFFREY M. BARTEL, Special
Agent
FEDERAL BUREAU OF
INVESTIGATION

Subscribed to and sworn before me
this 4th day of February, 2019.

ROZELLA A. OLIVER

_____
HON. ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE